590 A.2d 216
IN THE MATTER OF JOHN A. GILLESPIE, AN
ATTORNEY-AT-LAW.

Argued March 25, 1991—Decided May 17, 1991.

*Richard J. Englehardt*, Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Raymond S. Londa* argued the cause for respondent (*Londa & Londa*, attorneys).

PER CURIAM.

On November 28, 1989, this Court temporarily suspended respondent, John A. Gillespie, from the practice of law based on his guilty plea in federal court to a charge of willfully aiding

and assisting in the presentation of false corporate tax returns by J.P. Sasso, Inc., a construction company. On the motion of the Office of Attorney Ethics (OAE) for final discipline based on that conviction, see *Rule* 1:20–6(c)(2)(i), a majority of the Disciplinary Review Board (DRB) recommended that Gillespie be suspended for three years, retroactive to the date of his temporary suspension. Three members voted to disbar.

The full text of the DRB's Decision and Recommendation reads as follows:

This matter is before the Board on a Motion for Final Discipline filed by the Office of Attorney Ethics (OAE), based on respondent's guilty plea to willfully aiding and assisting in the presentation of false corporate tax returns by J.P. Sasso, Inc., a construction company, for the period ending June 30, 1985, in violation of 26 *U.S.C.A.* § 7206(2).

On December 27, 1989, respondent was sentenced to a term of three years' imprisonment, for which all but a period of 120 days was suspended. Respondent was placed on probation for three years, commencing on his release from confinement. He was also ordered to perform 600 hours of community service and to participate in an alcohol treatment program, if deemed necessary by the United States Probation Office.

The prosecution version of the facts is set forth in the presentence report:

The defendant pled guilty to a one-count Information charging him with aiding in the presentation of false corporate income tax returns of J.P. Sasso, Incorporated, for the period ending June 30, 1985. This defendant unlawfully assisted Joseph P. Sasso and others to divert $79,550.66 from the corporate accounts of J.P. Sasso, Inc., during the period of April 5, 1985, to July 23, 1985.

This matter came to the attention of federal law enforcement authorities as part of an ongoing investigation into labor racketeering in the Union County area. Search warrants were executed at several locations and one search warrant included a search of the home of one Joseph P. Sasso. Through analysis of the records of Mr. Sasso's construction company, J.P. Sasso, Inc., it came to the attention of investigating authorities that a large amount of cash had been generated through Mr. Sasso's business account. Mr. Sasso's business account, in the name of J.P. Sasso, Inc., was held at the First Fidelity Bank in Irvington, and later, the National State Bank in South Orange, New Jersey.

It came to the attention of the authorities that on three separate occasions checks were written on the corporate account of J.P. Sasso, Incorporated.

Two of the checks were written to [Oak Tree Road Associates].[1] The two checks were then deposited into the individual account of John Gillespie. Gillespie was aware that the check amounts were not reported on the corporate income tax. Mr. Gillespie is an attorney and a friend of John Palaia. One check in the amount of $51,520.66 was endorsed by Joseph P. Sasso and later endorsed by Mr. Gillespie and deposited in Mr. Gillespie's individual account on April 5, 1985. On July 8, 1985, a check in the amount of $10,530 was again written on the corporate account, endorsed by Mr. Sasso and endorsed by Mr. Gillespie and deposited into Mr. Gillespie's account. In order for a check drawn on a corporate account to be deposited in an individual account, it must have the approval of a bank officer. Mr. Palaia, as Vice President of Commercial Loans for the bank, approved the deposit of both corporate checks in an individual account. John Gillespie then wrote out checks drawn on his individual account to cash and gave the cash to Mr. Sasso. He wrote out approximately eight personal checks between April 1985 and July 1985, in amounts of less than $10,000. He wrote them in amounts of less than $10,000 so as to avoid Currency Transaction Reporting requirements. He was following the advice of Mr. Palaia. Mr. Palaia personally approved the checks and wrote his initials on the back of each one of them. Mr. Palaia performed this service for those connected with Mr. Sasso and no one else.

On June 14, 1985, the third check in the amount of $17,500 was drawn on the corporate account of J.P. Sasso, Inc. The check was endorsed by Mr. Sasso and Mr. Gillespie. Mr. Palaia authorized the deposit of the check into Mr. Gillespie's personal account. Mr. Gillespie then withdrew the $17,500 in two separate Treasurer's checks, one for $9,675, the other for $7,825. Both checks were authorized by Mr. Palaia. The $9,675 check was cashed by Mr. Gillespie, the $7,825 check was cashed by one John Amato after being endorsed by Mr. Gillespie and then co-endorsed by Amato. The $17,500 check was split into two separate checks so as to avoid Currency Transaction Reporting requirements. Mr. Amato was a bookkeeper for Mr. Sasso's business. Mr. Palaia advised Mr. Gillespie to split the checks so as to avoid Currency Transaction Reporting requirements. This money was not declared as income on the corporate tax return of J.P. Sasso, Inc. John Palaia and John Gillespie were aware that the money was not being reported on the corporate income tax return. Mr. Palaia was introduced to investors through his dealings with Mr. Sasso and Mr. Gillespie. Through a Mr. James Palermo, Mr. Palaia was introduced to one Vincent Craparotta, a partner of Mr. Palermo's in Beybrook Estates, a housing development in Dover, New Jersey. Palaia knew that Beybrook Estates needed "seed money" in order to get the project started. Mr. Palaia asked Mr. Craparotta about various lots

[1]Although the presentence report states that the two checks had been written to John Gillespie, at the sentencing proceeding respondent's attorney corrected that statement to reflect that the checks had been made out to Oak Tree Road Associates and endorsed by Sasso and respondent.

that were offered through Beybrook Estates. He was interested in them for investment purposes. Mr. Palaia obtained the three lots via a "gentlemen's agreement" with Mr. Craparotta to agree to purchase the lots for a total of $86,000. At that time Palaia was not required to put down any cash. One and one-half years later, Mr. Palaia inquired about selling the lots as he was in the processing of purchasing a home in Bridgewater, New Jersey. Palaia told Mr. Craparotta that he wanted to sell the options and he needed the money for a down payment for the new home. The two of them then decided that Palaia held the option to purchase. Mr. Craparotta needed a short term loan of $45,000 in which to pay Palaia. Palaia then wrote an internal bank letter for $45,000 to his bank, the National State Bank, stating that the loan was for on-site improvements for a company owned by Mr. Craparotta. He submitted the letter to the bank for approval. He later related to investigating agents that the justification for payments of the $45,000 to the company owned by Mr. Craparotta was false.

Palaia stated that he knew before he wrote the report that he was going to be the recipient of the $45,000 and that he would use the money at the closing of his newly purchased residence. Palaia was furnished with a photocopy of the Atria Construction Management Corporation check number 1336, dated August 21, 1987, for $45,000 and he said that it was the check that he had received from Mr. Craparotta. Atria Construction Management Corporation is owned by Mr. Craparotta.

Government sources indicate that the investigation is an ongoing one at this time. They stated that Mr. Palaia has been cooperative in their investigation. Pursuant to his plea agreement, he agreed to provide the grand jury testimony with regard to any criminal activity with regard to Messrs. Sasso, Palermo and Gillespie.

Respondent acknowledged that he knew that what he was doing was wrong. He explained, however, that in early 1985, he was suffering the consequences of heavy alcohol abuse, which eventually led to the break-up of the engagement with his present wife and the dissolution of his law partnership. After respondent went into a state of depression, he ultimately obtained counselling with a physician trained in alcohol abuse. For the past five years, respondent has abstained from drinking, except for an occasional glass of wine. As respondent indicated to the sentencing Court:

there's no question that from the outset, what I did I understand was wrong. I've acknowledged that fact throughout. I voluntarily appeared before two grand juries and at no point invoked the 5th.

* * * I'd like to think and what I'd like the Court to believe is that what I did do was an aberration reflective of my being out of control five years ago.... I fortunately could have [gone] either of two ways at that time, and I fortunately recognized the situation, addressed it, and hope to move on.

Respondent offered no plausible explanation for his illegal conduct. At the sentencing proceeding, the court inquired of respondent's counsel:

The Court: Why did Mr. Gillespie accommodate Mr. Palaia?

[Respondent's Counsel]: I think probably because he was in a depressed period of his life, because he was drinking, and someone asked him to do something.

Respondent derived no personal gain from his wrongful act. After July 1985, when he wrote the last check against the second sum of monies deposited in his personal account, respondent of his own accord refused to participate in subsequent illegal transactions.

On November 28, 1989, the Court temporarily suspended respondent from the practice of law. The Office of Attorney Ethics is seeking respondent's disbarment.

\* \* \* \*

At its June 20, 1990, hearing, the Board entertained respondent's cross-motion to remand this matter to the district ethics committee for the purpose of supplementing the record with mitigating evidence showing respondent's state of mind at the time of the illegal conduct. After a careful review of the record, supplemented with oral argument, the Board denied respondent's cross-motion for a remand for a limited evidentiary hearing but allowed respondent the opportunity to submit "any written affidavits, certifications, documents, reports, or any written evidence regarding the alcohol problems allegedly experienced by respondent, that might be relevant to the issue of mitigation."

To show that his behavior had been altered by excessive drinking during the relevant time, 1985, respondent offered six certifications or affidavits by persons who were close to him and who had witnessed his behavior routinely at that time. These include, among others, his present wife, his law associate, and his secretary for ten years. Attached to his wife's affidavit is a letter from A. Starr Ingram, M.D., a specialist in alcohol family therapy, who saw respondent late in 1986. Dr. Ingram's diagnosis was "physical and psychological addiction to alcohol." [2]

## CONCLUSION AND RECOMMENDATION

A criminal conviction is conclusive evidence of respondent's guilt in disciplinary proceedings. *In re Goldberg*, 105 *N.J.* 278, 280, 520 *A.2d* 1147 (1987); *In re Tuso*, 104 *N.J.* 59, 61 [514 *A.2d* 1311] (1986); *In re Rosen*, 88 *N.J.* 1, 3 [438 *A.2d* 316] (1981); *R.* 1:20-6(c)(1). No independent examination of the underlying facts is, therefore, necessary to ascertain guilt. *In re Bricker*, 90 *N.J.* 6, 10 [446 *A.2d* 1195] (1982). The only issue to be determined is the quantum of discipline to be imposed. *In re Goldberg, supra*, 105 *N.J.* at 280, [520 *A.2d* 1147]; *In re Kaufman*, 104 *N.J.* 509, 510 [518 *A.2d* 185] (1986); *In re Kushner*,

---

[2]Dr. Ingram reports that although respondent appeared for five visits, he declined further treatment through what is known as a formal intervention program. In her affidavit, respondent's wife explains that "by the time we saw Dr. Ingram, John had determined to 'straighten out' his life, was working diligently at his law practice, and had controlled his alcohol problems."

101 *N.J.* 397, 400 [502 *A.*2d 32] (1986); *In re Addonizio,* 95 *N.J.* 121, 123– 24 [469 *A.*2d 492] (1984); *In re Infinito,* 94 *N.J.* 50, 56 [462 *A.*2d 160] (1983); *In re Rosen, supra,* 88 *N.J.* at 3 [438 *A.*2d 316]; *In re Mirabelli,* 79 *N.J.* 597, 602 [401 *A.*2d 1090] (1979); *In re Mischlich,* 60 *N.J.* 590, 593 [292 *A.*2d 23] (1977).

The illegal activity underlying respondent's conviction is not related to the practice of law. *See In re Kinnear,* 105 *N.J.* 391, 395 [522 *A.*2d 414] (1987). Nonetheless, good moral character is a basic condition for membership in the bar. *In re Gavel,* 22 *N.J.* 248, 266 [125 *A.*2d 696] (1956). Any misbehavior, private or professional, that reveals lack of the good character and integrity essential for an attorney constitutes a basis for discipline. *In re La Duca,* 62 *N.J.* 133, 140 [299 *A.*2d 405] (1973).

The criminal offense for which respondent was convicted is indeed serious. The Court has not hesitated to disbar attorneys who were involved in serious criminal activities—see, *e.g., In re Mallon,* 118 *N.J.* 663 [573 *A.*2d 921] (1990), *In re Lunetta,* 118 *N.J.* 443 [572 *A.*2d 586] (1989), and *In re Alosio,* 99 *N.J.* 84 [491 *A.*2d 628] (1985)—or to impose a lengthy term of suspension in instances where disbarment was unwarranted. In *In re Silverman,* 80 *N.J.* 489 [404 *A.*2d 301] (1979), the attorney pleaded guilty to one count of obstruction of justice for having filed an answer in a bankruptcy matter and falsely stating that his client had a lawful right to keep custody of twenty-six tractors and trailers belonging to the bankrupt firm. The court took into account several mitigating factors in determining the extent of discipline to be meted out. The attorney had been a member of the bar for fifty years; he had cooperated with the ethics proceedings, candidly admitting his guilt and showing contrition; and no litigant or other person had suffered any loss. The Court viewed the attorney's action as an aberration unlikely to be repeated and imposed an eighteen-month suspension.

In *In re Kushner, supra,* 101 *N.J.* 397 [502 *A.*2d 32], the court imposed a three-year suspension on an attorney who pleaded guilty to one count of false swearing. The attorney lied, in a sworn certification to the court, that the signature on a $40,000 promissory note was not his but, rather, the product of forgery. In mitigation, the Court considered the attorney's unblemished twenty-three year professional record, his reputation and good character, and the absence of harm to any client.

More recently, in *In re Power,* 114 *N.J.* 540 [555 *A.*2d 1107] (1989), the Court suspended for three years an attorney who had pleaded guilty to one count of obstruction of justice. The attorney purposely advised a client not to disclose any information to law-enforcement authorities regarding a stock-fraud investigation, not to protect the client, but motivated by his own fear that he, too, was a target of the investigation. In addition, the attorney had assisted a client in filing a false claim with an insurance company, despite harboring a reasonable suspicion that the claim was false.

Here, too, respondent committed a serious crime. His conduct ran counter to the standard of morality and ethics required of members of the bar. Disciplinary proceedings, however, seek not to punish the attorney but to protect the public against attorneys who cannot or will not measure up to the high standards of responsibility required of every member of the profession. *In re*

*Getchius*, 88 *N.J.* 269, 276 [440 *A.*2d 1341] (1982) (citing *In re Stout*, 76 [75] *N.J.* 321, 325 [382 *A.*2d 630] (1978)). "The severity of the discipline to be imposed must comport with the seriousness of the ethical infraction in light of all the relevant circumstances." *In re Nigohosian*, 86 [88] *N.J.* 308, 315 [442 *A.*2d 1007] (1982). Mitigating factors are, therefore, relevant and may be considered. *In re Hughes*, 90 *N.J.* 32, 36 [446 *A.*2d 1208] (1982).

In mitigation, a majority of the Board considered that respondent's abuse of alcohol at the relevant times was a contributing factor to his loss of good judgment. Although his dependency on alcohol did not "demonstrate ... the kind of loss of competency, comprehension, or will that can excuse the misconduct," *In re Hein*, 104 *N.J.* 297, 303 [516 *A.*2d 1105] (1986), it did "blunt the blameworthiness of his misconduct." *In re Barbour*, 109 *N.J.* 143, 159 [536 *A.*2d 214] (1988).

The record before the Board persuaded it that respondent has regained control of his life: he overcame his alcohol problems five years ago; has completed the custodial portion of his sentence; shares a loving and stable marriage with his present wife; and enjoys the trust, love, and support of his many friends, family members, and colleagues. To disbar him would be more vindictive than just. *In re Verdiramo*, 96 *N.J.* 183, 187 [475 *A.*2d 45] (1984).

Furthermore, several other mitigating circumstances convince the Board that a term of suspension is sufficient discipline for respondent's criminal act: (1) respondent's misconduct did not arise from the legal representation of clients; (2) his wrongful actions were not undertaken to derive any personal gain therefrom; (3) prior to the within matter, he enjoyed a blameless record at the bar; (4) approximately eighty letters of recommendation attest to his moral character and good reputation; (5) he participated in numerous civic activities; (6) he cooperated with the criminal justice system by readily conceding his guilt, and assisted the United States Department of Justice's investigation without asserting his constitutional privilege against self-incrimination and without the benefit of any agreement concerning subsequent prosecution, and more significantly, (7) he renounced his past misconduct shortly after its occurrence: of his own volition, respondent refused to participate in further illegal transactions with Sasso and Palaia prior to being apprehended.

Additionally, respondent has paid dearly for his serious mistakes. He spent 120 days in jail; the publicity generated by his conviction caused him shame and humiliation; his law partnership was dissolved as a result of his alcohol abuse and consequent failure to attend to his professional obligations; and he was forced to face bankruptcy proceedings.

The Board gave no consideration to the OAE's contention that respondent's "involvement with individuals reputed to be connected with organized crime" was to be taken into account in recommending proper discipline. The Board's review and evaluation of the record cannot include unproven allegations.

In sum, a majority of the Board is satisfied that respondent's criminal offense was a single episode of aberrational conduct, unlikely to be repeated. Respondent's control of his judgment was weakened by excessive use of alcohol at the time of the offense. The Board is not convinced that respondent's conduct was so "immoral, venal, corrupt or criminal as to destroy totally any vestige of

confidence that the individual could ever again practice in conformity with the standards of the profession." *In re Templeton,* 99 *N.J.* 365, 376 [492 *A.*2d 1001] (1985).

After balancing, on one hand, the seriousness of the offense and the need to maintain public confidence in the bar with, on the other hand, the great weight accorded here to mitigating evidence, the requisite majority of the Board recommends that respondent be suspended for a period of three years, retroactive to November 28, 1989, the date of respondent's temporary suspension. Three members voted for disbarment, believing that respondent, systematically and over a period of time "laundered" money for an illegitimate purpose, and that although alcohol abuse may have contributed to his susceptibility to Sasso's illegal entreaties, it did not cause substantial cognitive impairment. Two members did not participate.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.

Our independent review of the entire record, including the proceedings in connection with the federal prosecution, satisfies us that the recommendation by the majority of the DRB for three years' suspension represents the appropriate discipline. The OAE opposes that recommendation and seeks disbarment essentially on two bases: (1) respondent's involvement with persons reputed to be connected with organized crime, and (2) respondent's "laundering" of money for an illegitimate purpose. Neither of the foregoing factors, however, finds clear and convincing support in the record. Any knowledge by Gillespie of a connection between Sasso, the beneficiary of respondent's dereliction, and an organized criminal element is a matter of speculation and inference rather than clear and convincing proof. Moreover, the federal court put to rest the "money laundering" charge during the sentencing proceedings when it made clear—and the government's representative agreed—that respondent's offense did not involve "laundering" in any sense other than its "generic" meaning of "an avoidance of filing currency transaction reports."

Despite the serious nature of the offense for which defendant stands convicted, the substantial mitigating factors recited by the DRB, see *supra* at 87–88, 590 *A.*2d at 221, favor discipline short of disbarment. We therefore order that respondent be suspended from the practice of law for three years retroactive

to the date of his temporary suspension, November 28, 1989, and until further order of this Court. The vacating of the Order of Suspension will be conditioned on a report, satisfactory to the OAE, from a specialist in alcohol family therapy or similar field of expertise, attesting to respondent's progress towards recovery from his alcoholism. Respondent is to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For Suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

It is ORDERED that JOHN A. GILLESPIE of ELIZABETH, who was admitted to the bar of this State in 1976, is hereby suspended from the practice of law for three years, retroactive to November 28, 1989, and until the further order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Regulation 23 of the Administrative Guidelines Governing Suspended Attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.