SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In the Matter of Frank J. Cozzarelli, An Attorney at Law** (D-151-13) (074742)

**Argued October 21, 2014 -- Remanded October 30, 2014 -- Reargued November 10, 2015 -- Decided May 2, 2016**

**PER CURIAM**

In this attorney disciplinary matter, the Court considers the appropriate level of discipline for respondent Frank J. Cozzarelli, who committed misconduct involving the misappropriation of client and escrow funds.

Since 1998, respondent had been intermittently under investigation by the United States Attorney's Office for income tax evasion. In connection with his role as treasurer of a fraudulent investment fund, respondent was indicted on September 21, 2004, after which he suffered a breakdown. On September 26, he was voluntarily admitted to an inpatient psychiatric unit, from which he was discharged on October 4, the day of his arraignment. In January 2005, respondent pled guilty to income tax evasion and was sentenced to four months in jail, followed by four months of house arrest and a probationary term. He was incarcerated from June through October 2005.

Shortly before the indictment, on August 2, 2004, Office of Attorney Ethics (OAE) Auditor Mimi Lakind notified respondent that a random audit would occur at his office at the end of that month, encompassing a two-year period prior to the audit date. The audit ultimately commenced in November 2004, after respondent had been released from inpatient care and while he remained under psychiatric care. According to Lakind, respondent maintained an active practice, including many real estate transactions per month and an active chancery docket. She asserted that respondent initially did not provide her with any recordkeeping documents, other than some records prepared by a family member who was a certified public accountant. In light of the criminal matter, Lakind postponed the audit. Although she requested additional documents, she never received them. Respondent was temporarily suspended in February 2005 following his guilty plea, at which time Lakind proceeded to reconstruct respondent's records based on subpoenaed bank records and other documents.

A demand audit ultimately resumed on December 18, 2008, at which time respondent presented Lakind with "new records" he had prepared on an Excel spreadsheet. According to Lakind, these materials were not reflective of the records of which she was aware in November 2004. Significantly, Lakind explained that, in addition to respondent's recordkeeping issues, she had uncovered "a systematic and continuing invasion of client trust funds for respondent's law office and personal expenditures." Respondent was charged with several counts of knowing misappropriation for: (1) misappropriating $112,728.93 in client funds for personal purposes; (2) improperly transferring funds from one client's trust account to the account of another unrelated client; and (3) repeated occurrences of borrowing against trust accounts for personal purposes and to replenish other accounts.

At the disciplinary hearing, respondent, citing In re Jacob, 95 N.J. 132 (1984), maintained that, in light of his debilitating depression, he should be absolved of improprieties or granted mitigation in terms of the quantum of discipline imposed. Respondent's psychiatrist testified that, at the time of the audit, respondent was not functioning efficiently and was not competent to manage the trust funds. The OAE's expert disagreed, asserting that respondent's mental state did not support a finding of legal insanity, or any of the other conditions that would satisfy the Jacob standard. The special master rejected respondent's Jacob defense, concluded that he knowingly misappropriated client funds, and recommended disbarment. Following a de novo review, the DRB concurred that the proofs were sufficient to establish knowing misappropriation on four of the nine charges. Like the special master, the DRB rejected respondent's Jacob defense, concluding that his major depression did not satisfy the requisite standard for legal insanity and noting that he continued to function both personally and professionally during the time he misappropriated funds. Consequently, the DRB determined that respondent should be disbarred.

The Court ordered respondent to show cause on the disbarment recommendation and, following argument on the matter, remanded to the DRB for a more full analysis of the evidence submitted in connection with respondent's Jacob defense. The Court retained jurisdiction.

On April 20, 2015, the DRB reaffirmed its recommendation that respondent be disbarred for the knowing misappropriation of escrow and client funds. The DRB explained that the Jacob standard has been reiterated and

applied by the Court, in In re Greenberg, 155 N.J. 138, 156-59 (1998), and other matters, functioning as the equivalent of the M'Naghten standard, the standard for legal insanity under criminal law. The DRB further explained that the Court has often referred to the Jacob standard as the inability to distinguish between right and wrong or to understand the nature and quality of one's acts, and not as an impairment of judgment. With respect to respondent's misconduct, the DRB noted that there was considerable evidence demonstrating that he had not suffered a loss of competency or will such that his knowing misconduct could be excused. Specifically, he handled numerous professional and personal matters while managing to conceal the federal criminal investigation from his wife. The DRB explained that depression does not satisfy the Jacob standard unless it deprived the attorney of the knowledge that he was taking funds that did not belong to him and that he was not authorized to take.

**HELD:** There is clear and convincing evidence the respondent knowingly misappropriated client funds, and that his mental illness did not cause him to suffer a loss of competency, comprehension or will that excused his misconduct when it occurred. Respondent is not entitled to mitigation and shall be disbarred.

1. In New Jersey, disbarment is permanent. R. 1:20-15A(a)(1). An attorney who knowingly misappropriates funds from a client is subject to disbarment without any practical prospect of consideration of mitigating factors or restoration upon a showing of reformation. In re Wilson, 81 N.J. 451 (1979). Misappropriating attorneys claiming to be afflicted with identifiable disorders, such as mental illness, have not swayed the Court from imposing disbarment. (pp. 18-19)

2. In Jacob, supra, the Court rejected the argument that an attorney's medical condition exculpated his misappropriations, emphasizing that it was looking for a causal connection between the condition and the financial misdeed. The Court further stated that the attorney had not demonstrated that he had suffered a loss of competency, comprehension, or will of a magnitude that could excuse his knowing egregious misconduct. Although these comments reference a standard that traces language used in diminished capacity cases, several subsequent cases in which a so-called Jacob defense was advanced collapsed the standard into shorthand in which it is described essentially as an ability to discern right from wrong. In Greenberg, supra, the Court rejected an attorney's asserted defense that his depression caused an impairment of judgment that should allow him to avoid disbarment for stealing law firm funds. The Court explained that the attorney failed to demonstrate that he could not appreciate the difference between right and wrong or understand the nature and quality of his acts. (pp. 19-22)

3. The DRB applied Jacob, Greenberg, and other cases to the matter at hand, concluding that the Jacob standard requires either an inability to distinguish between right and wrong or to understand the nature and quality of one's acts. Those two expressions of understanding can be likened to the standard for legal insanity, under the M'Naghten test, and the standard for diminished legal responsibility under principles of diminished capacity or the statutory defense of intoxication. While the Jacob standard may not be a model of clarity, it nevertheless expresses the Court's willingness to consider defenses that would negate the mental state to act purposely. Thus, a mental illness that impairs the mind and deprives the attorney of the ability to act purposely or knowingly, or to appreciate the nature and quality of the act he was doing, or to distinguish between right and wrong, will serve as a defense to attorney misconduct and should be considered in connection with excusing wrongful conduct by an attorney, or when mitigation of a disciplinary penalty is appropriate to consider under New Jersey's disciplinary jurisprudence. (pp. 22-23)

4. Here, the experts agreed that respondent did not have a mental illness that met any of the aforesaid three defenses that negate the mental state to act knowingly. While the Court agrees with respondent that the Jacob standard is not restricted to making a showing that is equivalent to the M'Naghten standard for legal insanity under criminal law, it rejects respondent's contention that the DRB's decision is undermined by its focus on the legal insanity standard. The DRB correctly concluded that the OAE has proven knowing misappropriation by clear and convincing evidence, and the Court concludes that respondent's misdeeds were not aberrational. Respondent has not proven a causal connection between his mental illness and his acts of misappropriation, and the Court is not persuaded that he is entitled to mitigation of the normal penalty of disbarment due to his severe depression. On this record, as amplified by the supplemental decision of the DRB, respondent committed knowing misappropriation. Consequently, respondent is disbarred. (pp. 23-26)

  So Ordered.

  **JUSTICES LaVECCHIA, ALBIN, and PATTERSON, and JUDGES CUFF and FUENTES (both temporarily assigned) join in this PER CURIAM opinion. CHIEF JUSTICE RABNER and JUSTICES FERNANDEZ-VINA and SOLOMON did not participate.**

IN THE MATTER OF

FRANK J. COZZARELLI,

An Attorney at Law


Argued October 21, 2014 – Remanded October
30, 2014 - Reargued November 10, 2015 –
Decided May 2, 2016

On an Order to show cause why respondent
should not be disbarred or otherwise
disciplined.

Maureen G. Bauman, Deputy Ethics Counsel,
argued the cause on behalf of the Office of
Attorney Ethics.

S.M. Chris Franzblau argued the cause for
respondent (Franzblau Dratch, attorneys; Mr.
Franzblau, Stephen N. Dratch and Frank J.
Cozzarelli, on the briefs).


PER CURIAM

Respondent, Frank J. Cozzarelli, was recommended for

disbarment in a decision by the Disciplinary Review Board (DRB).

On the return date of an Order to Show Cause issued by this

Court as to why he should not be disbarred for the knowing

misappropriation of client and escrow funds, respondent

contended that he presented mental illness evidence that had not

received proper consideration by the DRB, under In re Jacob, 95

1

N.J. 132 (1984). Because we were concerned about respondent's assertion that his Jacob defense was not properly considered and addressed by the DRB, we extended these already lengthy proceedings by remanding the matter to the DRB for fuller examination and explanation, including but not requiring the possibility of further evidentiary proceedings. We retained jurisdiction.

This matter is presently back before us following the DRB's issuance of a supplemental decision that, in greater detail, explains its adherence to its recommendation that respondent should be disbarred. We have had re-briefing and re-argument following issuance of the DRB's supplemental decision.

Before this Court, respondent continues to maintain that the DRB has misapplied Jacob. Respondent argues that he was entitled to have his Jacob defense of mental illness considered in connection with mitigation of penalty as well as for purposes of providing a defense to the charged misconduct. For the reasons expressed herein, we conclude that respondent's arguments have received full and fair consideration.

Based on the proofs, we agree with the DRB that there is clear and convincing evidence of knowing misappropriation of client funds, that respondent's mental illness of depression did not cause him to suffer a loss of competency, comprehension or will that excused the acts of misappropriation when they

2

occurred, and that he is not entitled to mitigation of our almost-invariable penalty of disbarment for such egregious misconduct based on the depression he undoubtedly suffered in connection with his federal investigation, indictment, plea, and sentence. We therefore accept the DRB's recommendations and hold that respondent shall be disbarred based on the proof of knowing misappropriation of client and escrow funds.

I.

In light of the extended history to this matter, we will summarize the salient procedural and factual aspects to this misappropriation-based disciplinary action.

Following a full hearing culminating in a recommendation of disbarment by an appointed special master, the DRB unanimously recommended respondent's disbarment for the knowing misappropriation of client and escrow funds charged in counts three, four, eight, and nine of the Office of Attorney Ethics's (OAE) complaint, and for violation of RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) and RPC 8.4(d) (conduct that is prejudicial to the administration of justice). The charges arose out of audit irregularities, including trust account shortages that were uncovered during a random audit, which turned into a demand audit, conducted by the OAE between November 22, 2004 and December 18, 2008. The lengthy duration of that audit needs to be placed in context.

3

On August 2, 2004, OAE Auditor Mimi Lakind notified respondent that a random audit would occur at his office at the end of that month and would encompass a two-year period prior to the audit date. The audit was rescheduled twice at respondent's request. The audit did not commence until November 2004 and took a long time to bring to conclusion.[1]

According to respondent, when the audit began in November 2004, he was "not functioning very well" and was under psychiatric care. In fact, when respondent learned that an attorney ethics audit would take place, he was weeks away from being indicted by the United States Attorney's Office for income tax evasion, for which he had been intermittently under investigation from 1998 until his indictment on September 21, 2004 in connection with his role as treasurer of a fraudulent investment fund.

---

[1] In the midst of responding to the OAE auditor's requests for documents and information in connection with the audit, respondent was temporarily suspended on September 24, 2005, and the audit was indefinitely postponed. That suspension from the practice of law was due to respondent's entry of a guilty plea to one count of income tax evasion, in violation of 26 U.S.C. § 7201. In re Cozzarelli, 182 N.J. 387 (2005). On March 9, 2006, well before the audit was brought to conclusion, the thirteen-month temporary suspension from active practice that respondent had served was determined to constitute sufficient attorney discipline for the federal tax evasion offense, In re Cozzarelli, 186 N.J. 156 (2006); thereafter, respondent was reinstated to practice in January 2007. See In re Cozzarelli, 189 N.J. 209 (2007). He has remained in active status throughout these proceedings.

4

Although not squarely germane to this matter, a brief history on what has been referred to by the DRB as "the Mallet Investment" is necessary. The special master report described the Mallet Investment venture succinctly as follows:

> Through various persons, Respondent was contacted by an Edward Mallet, with whom Respondent developed a friendship. Mr. Mallet involved the Respondent in the development of schemes to create an Investment venture, and to that end ultimately [provided] Respondent with more than $10,000,000.00 ostensibly in order to obtain a fixed place of business for an "investment company" and to establish banking connections in the United States and Europe to attract investors and establish a "hedge fund." Other parties to the scheme were introduced by Mr. Mallet, and it is reasonable to infer that Mr. Mallet intended, and did in fact use the Respondent as a "fall guy" by convincing Respondent to accept and handle monies, the source of which has not been established, and to transfer those funds to persons designated by Mr. Mallet, in some way to cause their disappearance.

Although the special master's report noted that it was "clear . . . that Respondent had neither the knowledge [n]or experience to have concocted whatever scheme Mr. Mallet was engaged in," respondent's income tax evasion conviction arose from his failure to pay taxes on profits generated by those investments.

Based on the record as presented by respondent and as supplemented by his medical expert, by September 2004, respondent had known of the potential indictment for several months, was in a state of anxiety, and ultimately suffered a

5

breakdown when he was informed that a federal grand jury had indicted him. During the days spanning September 21 through September 26, 2004, respondent formulated a suicide plan and absented himself from family and friends to execute it, travelling in and around New Jersey, stopping in New York City, Atlantic City, and Philadelphia. Eventually he abandoned his suicide plan, reconnected with family and an attorney, and determined to face the criminal charges. Respondent had not told his family about the potential criminal charges beforehand.

With familial, legal, and medical assistance,[2] on September 26, 2004, respondent was voluntarily admitted to an inpatient psychiatric unit in Valley Hospital. He was discharged on October 4, 2004. On the day of his discharge, respondent was arraigned in the United States District Court for the District of New Jersey. He pleaded guilty in January 2005 to income tax evasion and was sentenced to four months in jail, followed by four months of house arrest and a probationary term. He was incarcerated from June through October 2005.[3]

---

[2] Respondent's admitting and treating psychiatrist, Dr. Steven S. Simring, testified in this matter as a fact witness and as respondent's expert.

[3] In sentencing respondent, the federal district court commented on the number of supportive letters that were submitted on respondent's behalf and recounted respondent's professional success and contributions to the community. The court expressed hope that respondent would be restored to the practice of law where he could continue to contribute. Those comments were

6

The audit that OAE Auditor Lakind attempted to perform in November 2004 was therefore conducted after respondent had been released from inpatient care and while he remained under psychiatric care. According to respondent, he had counsel for some period during audit preparations but was unable to pay for ongoing representation. Assistance came from family members and others who helped to secure documents that had been requested by the OAE in advance of the audit. In Lakind's testimony at the hearing before the special master, she said that respondent initially did not provide her with any recordkeeping documents other than some records prepared by a family member who was a certified public accountant; those did not detail whose money was whose among the various clients and accounts for which respondent was responsible. According to Lakind, respondent had maintained an active practice that involved many real estate

---

relied upon by respondent in this matter and we give them favorable acknowledgment. However, they were expressed based on knowledge of only the federal conviction for tax evasion, which more likely than not results in suspensions from practice, not disbarment. See, e.g., In re Rakov, 155 N.J. 593 (1998) (imposing two-year suspension for attempted income tax evasion); In re Gillespie, 124 N.J. 81 (1991) (three-year suspension for aiding and assisting in presentation of false corporate tax returns); In re Nedick, 122 N.J. 96 (1991) (imposing two-year suspension for tax evasion mitigated by cooperation with federal authorities); cf. In re Turco, 66 N.J. 50 (1974) (imposing disbarment for tax fraud). The misappropriation charges were not yet in the picture as the audit had been postponed while respondent addressed his federal criminal charges.

transactions per month and included an active chancery docket. We also note that respondent held numerous court appointments as a fiduciary.[4] Lakind testified that she also was provided with a disc that included a voluminous list purporting to identify all of the files in respondent's office.

Concerned about the level of stress that respondent was exhibiting during the November 2004 audit proceeding, Lakind informed respondent that the audit would be postponed so that respondent could focus on his federal criminal matter. On December 10, 2004, respondent was notified that the audit would resume in February 2005. Lakind testified that she requested additional records but never received them. Respondent was temporarily suspended by February 2005 as a result of the guilty plea in federal district court. Lakind testified that she proceeded to reconstruct respondent's records, preparing spreadsheets based on subpoenaed bank records and documents received from succeeding trustees on respondent's former fiduciary accounts, information listed on checks, and other documents. Lakind added that, following respondent's

---

[4] In connection with respondent's inability to provide Lakind with any recordkeeping documents in November 2004, we note that shortly after his arraignment in federal court, respondent was removed from his many court-appointed fiduciary positions and was faced with the obligation to turn over and account for the contents of funds that he had held as a fiduciary. The absence of respondent's recordkeeping files is sorely troubling and is discussed later.

reinstatement to the practice of law, she received a Quickbooks form from respondent's accountant, Samuel Fisher, which substantially agreed with her reconstructed figures. Respondent himself informed Lakind that he could not produce any additional records due to the disarray of his professional belongings while he was incarcerated.[5]

When a demand audit resumed on the substantially later date of December 18, 2008, respondent presented Lakind with "new records" he had prepared on an Excel spreadsheet; however, according to Lakind, those materials were not reflective of the records she was aware of in November 2004.

More problematic for respondent, Lakind testified that in addition to the recordkeeping issues uncovered during the audit, she uncovered "a systematic and continuing invasion of client trust funds for respondent's law office and personal expenditures." Those patterns, she testified, revealed shortages in his accounts. According to Lakind's testimony,

> beginning with his own accountant's reconciliation as of December 31st, 2003, there were shortages in the account. And then I found that money from the fiduciary accounts went into the Trust Account and were used to pay other clients.

---

[5] Respondent testified that his brother, who was his landlord, took back his office space to lease it to a new tenant. Respondent's belongings were removed to accomplish the re-leasing. Although respondent had packed and stored his records in an onsite trailer, he claimed the records became disarrayed or destroyed following the demolition work that took place.

9

The critical time came when Mr. Cozzarelli had to turn over a number of fiduciary accounts to other attorneys or successor trustees or administrators, and so the amounts that were held in the Trust Account had to be paid out and there was insufficient money to pay them.

And I found that just before the payment of each matter deposits were made from personal funds of Respondent equal to clear the checks. In all that time, and with all those shortages, not a single check, not one, was presented on insufficient funds and either paid or dishonored by the bank, none.

When asked if she would have expected no check to bounce if respondent's records were in such poor condition that he could not keep track of financial matters, Lakind explained that she would have expected the opposite of what she in fact found.

That's usually the best indication where an attorney has no idea what's in there, will write a check thinking he's probably got the money in there. That's why we have the overdraft notification program, it's exactly why it was put into effect, so that where an attorney, either through negligence or through design, does not have enough money and a check is presented, whether it's paid or not, even if it's paid, we are notified by the bank that a Trust Account was presented against insufficient funds and we immediately contact the attorney and we ask for proof of what happened and why that happened.

And in all this time I never found a single Trust Account bank statement in which there was an overdraft balance or [that a check written for an amount in excess of the account's balance was returned]. . . . There was always sufficient funds at the moment a check was presented for the check to clear.

10

Following the conclusion of the demand audit, on December 18, 2008, respondent was charged with several counts of knowing misappropriation for: (1) misappropriation of $112,728.93 in client funds for personal purposes; (2) improper transfer of funds from one client's trust account to the account of another unrelated client; and (3) repeated occurrences of borrowing against trust accounts for personal purposes, including for fees he believed he was owed and to replenish other trust accounts.

At the disciplinary hearing, respondent maintained that, because he suffered from the debilitating mental illness of severe depression, he should be absolved of improprieties or at the least granted mitigation in terms of the quantum of discipline to be imposed, citing Jacob, supra, 95 N.J. 132. Dr. Simring, a board-certified psychiatrist, testified on respondent's behalf as an expert and as his treating physician. Dr. Simring opined that respondent was not functioning efficiently or rationally and was not competent to manage the trust funds at the time of the audit. The OAE's expert, board-certified psychiatrist Daniel Paul Greenfield, M.D., testified that, during 2003-2005, respondent's mental state did not support a finding of legal insanity, or any of the other conditions that would satisfy the Jacob standard (mentioning also intoxication or diminished capacity as among those other conditions that could provide a form of Jacob defense but that

11

were inapplicable to the present matter). Dr. Greenfield expressed his opinion that respondent's depression was situational and that he was functional at the time when he engaged in the unethical conduct that formed the basis for the disciplinary charges against him.

The special master found that respondent knowingly misappropriated client funds. He rejected respondent's Jacob defense, finding that there was no medical evidence that respondent suffered from a mental illness sufficient to excuse his misappropriating conduct. As noted earlier, the special master's report recommended respondent's disbarment as the only appropriate discipline for his misappropriation of client funds.

Following a de novo review, the DRB determined that the evidence clearly and convincingly established that respondent was guilty of knowing misappropriation, although not on all counts. It found the proofs sufficient, under the clear and convincing standard, on four out of nine of the charges.

The DRB's August 8, 2014, decision recounts the basis for its findings in full but, in sum, the DRB found as follows. With respect to count three, involving the Arthur R. Haberman Irrevocable Trust, the DRB concluded that the proofs established that respondent knowingly misappropriated $100,000 from that trust on November 3, 2004, to cover a shortage in another trust that respondent had been managing until he was removed,

12

following his arraignment, from his court-appointed position of fiscal agent and replaced by another attorney. Similarly, with respect to count four, involving the Barrillas-to-Gencarelli real estate transaction, the DRB found that respondent failed to maintain the necessary funds in his trust account following the closing, having used $100,000 of the funds to reimburse the Haberman trust on February, 11, 2005. With respect to count eight, involving the Boyko Trust, the DRB determined that the evidence showed that respondent was not authorized to transfer, on May 5, 2004, $50,000 from the trust to his business account to pay legal fees in his criminal case. Finally, on count nine involving the Sciarrillo estate, the DRB determined that respondent provided no evidence to support his claim that the estate owed him $200,000, which he took from the estate between September 27, 2004 and November 1, 2005.

The DRB also rejected respondent's Jacob defense, concluding that respondent's diagnosis of major depression did not satisfy the requisite standard for legal insanity to obtain relief under Jacob. To the DRB it was significant that, despite his depression, respondent continued to function personally and professionally and that, during that time, he systematically engaged in "lapping," or taking one client's funds to pay obligations owed to another, while ensuring that the funds were replenished when it came time to repay the first client.

13

Consequently, the DRB determined that respondent should be disbarred.

We issued an Order to Show Cause on the disbarment recommendation and, following argument on the matter, remanded to the DRB

> with instruction that the Board more fully assess the evidence submitted in connection with respondent's proffered defense pursuant to In re Jacob, 95 N.J. 132 (1984), and provide a detailed explanation of whether or not respondent has met the standard set forth in Jacob. The Disciplinary Review Board retains the authority to remand the matter to a special ethics master if it deems such a course warranted.

We also retained jurisdiction.

In a decision dated April 20, 2015, the DRB reaffirmed its recommendation that respondent be disbarred for the knowing misappropriation of escrow and client funds. The DRB addressed in detail its reasons for rejecting respondent's argument that, under Jacob, he should be excused or have his penalty mitigated due to his mental illness.

First, the DRB addressed the Jacob standard. The DRB quoted the standard first articulated in Jacob and noted that it has been reiterated and applied by this Court, in In re Greenberg, 155 N.J. 138, 156-59 (1998), and other matters,

14

functioning as the equivalent of "the M'Naghten standard."[6]  The

DRB decision recited numerous occasions on which this Court has

"referred to the Jacob standard as the inability to distinguish

between right and wrong or to understand the nature and quality

of one's acts."  The DRB commented that neither the Jacob

standard nor the M'Naghten standard "is satisfied by a

demonstration of an 'impairment of judgment.'"

Second, the DRB detailed why the evidence offered by

respondent failed the Jacob test as the DRB understood it.

Critically important, that analysis bears repeating in

full:

> [N]either respondent nor [Dr.] Simring, his expert, offered any evidence to support the conclusion that, at the time of the knowing misappropriations, respondent "suffered a loss of competency, comprehension or will of a magnitude that could excuse or mitigate egregious misconduct that was clearly knowing, volitional and purposeful." Jacob, supra, 95 N.J. at 137.  In respondent's only instance of knowing misappropriation that preceded the September 2004 indictment, no evidence established that, at the time (May 5, 2004), he was anything more than depressed. Respondent claimed that he was "in such a deep depression that [he] couldn't figure out what was going on."  We note that there is considerable evidence to the contrary.  He

---

[6] M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843); see also State v. Breakiron, 108 N.J. 591, 616 (1987) ("[T]he insanity defense as modified in New Jersey is strictly limited to the M'Naghten principle of whether or not the defendant was either unable to know the nature and quality of the act he was doing . . . or, if he did know it, that he did not know that what he was doing was wrong.").

15

handled quite a few personal and professional matters, during that time, and he was able to conduct himself in such a fashion that his wife had no suspicion that he was under a federal criminal investigation. Moreover, the inability to figure out "what is going on" is a far cry from not being able to distinguish between right and wrong.

As stated previously, depression, "however severe," is insufficient to satisfy the Jacob standard, unless the condition deprived the attorney of the knowledge that he was taking funds that did not belong to him and that he was not authorized to do so. Greenberg, supra, 155 N.J. at 158-59. No such showing was established in this case.

. . . .

Finally, we note that, despite respondent's insistence that his conduct was an aberration and that he has since reformed, the record shows otherwise. As we found, as late as September 2008, respondent gave the OAE a ledger that he had prepared for [a] trust, after the fact. That ledger falsely showed that the $50,000 that respondent had paid to his lawyer in the federal criminal matter had gone to a beneficiary of the trust instead. Thus, nearly four years after respondent's so-called breakdown, three years after his release from incarceration for having committed a felony, and despite his successful treatment with [Dr.] Simring, respondent was still engaging in dishonest conduct designed to conceal the fact that he deliberately and intentionally took monies that did not belong to him and used them to fund his defense in the federal criminal matter.

II.

Respondent argues that the DRB's analysis on remand erroneously perpetuated an interpretation of the Jacob standard

16

that requires a showing that meets the criminal law standard for the defense of legal insanity. He maintains that Dr. Greenfield, the OAE's expert, applied only the M'Naghten standard to assess respondent and opine on whether respondent could avail himself of a Jacob excuse to knowing misappropriation and disbarment. On the other hand, respondent maintains that his expert, Dr. Simring, opined on his mental illness and reasons why his mental condition merited mitigating consideration, which is also permitted under Jacob. In that regard, respondent argues that Dr. Simring's opinion is unopposed.

The OAE argues that the DRB properly considered the mental health circumstances that had been advanced by respondent and correctly concluded that proof of knowing misappropriation was demonstrated clearly and convincingly. It emphasizes the timing of the four incidents of misappropriation and that respondent's expert, Dr. Simring, does not contend that respondent could not appreciate the wrongfulness of his actions at those times. In essence, the OAE maintains that respondent did not show impairment at the time of those misappropriations that deprived him of the ability to know that he was taking funds that did not belong to him and that he was not authorized to do so.

Moreover, in arguing against allowing mitigating effect to be afforded to respondent in this disciplinary matter due to his

diagnosis of severe depression by Dr. Simring, the OAE contends, and the DRB concluded, that three of the misappropriations took place after respondent had been discharged from the hospital, was under Dr. Simring's care and responding well to medication, and was participating in the handling of his criminal matter. Thus, the OAE maintains that respondent's misdeeds were not aberrational and, as further proof of that, adds one more incident to the mix. Four years after his hospitalization, three years after his incarceration, and still while under Dr. Simring's care, respondent, according to the OAE, and as found by the DRB, submitted false information in financial records to hide evidence of misappropriation from another trust for which respondent was responsible.

## III.

In this State, two rules in attorney misconduct matters are applied, virtually without exception. First, disbarment is permanent. R. 1:20-15A(a)(1); see also In re Breslin, 171 N.J. 235, 237 (2002) (noting that "in New Jersey disbarment invariably is permanent"). Second, an attorney who knowingly misappropriates funds from a client is subject to disbarment, In re Wilson, 81 N.J. 451, 453 (1979), without any practical prospect of consideration of mitigating factors, id. at 457-60, or restoration upon a showing of reformation, id. at 460 n.5 (noting that "research reveals only three orders of

18

reinstatement following disbarment over the past hundred years"); see also Greenberg, supra, 155 N.J. at 151 ("We accept as an inevitable consequence of the application of th[e Wilson] rule that rarely will an attorney evade disbarment in such cases.").

Misappropriating attorneys claiming to be afflicted with identifiable disorders, including mental illness or related conditions, have not swayed the Court from imposing the grave discipline of disbarment. See Greenberg, supra, at 150, 157-58.

In Jacob, supra, the Court considered, as part of the defense to a knowing-misappropriation-of-client-funds case, a medical report by the physician of the respondent that addressed certain physical and mental health conditions, including depression, suffered by the attorney. 95 N.J. at 134-35, 137. The Court spoke sympathetically to the lawyer's plight but nevertheless rejected the argument that the medical evidence served to "exculpate [the] misappropriations." Id. at 136. The Court explained that the medical proofs did not demonstrate that the condition from which the respondent suffered "was an exclusive or major cause of his ethical derelictions." Id. at 137. The Court emphasized that it was looking for a demonstration of a causal connection between the medical condition and the financial misdeed. Ibid. The Court closed

with the following restatement of its reasons for rejecting the proffered defense:

> The report does not furnish any basis grounded in firmly established medical facts for a legal excuse or justification for respondent's misappropriations. There has been no demonstration by competent medical proofs that respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful.
>
> [Ibid.]

Although the Court's closing comments referred to legal excuse or justification, and mentioned "loss of competency, comprehension or will," a standard that traces language used in diminished capacity analyses, several subsequent cases in which a so-called Jacob defense was advanced collapsed the standard into shorthand in which it is described essentially as an ability to discern right from wrong. See In re Hein, 104 N.J. 297, 302 (1986); see also In re Romano, 104 N.J. 306, 311 (1986) (concluding that "respondent has failed to demonstrate that a disease of the mind rendered him unable to tell right from wrong or to understand the nature and quality of his acts"). The DRB decision in this matter discusses subsequent cases that have attempted to argue for mitigation of penalty based on "loss of competency, comprehension or will" language that was used in Hein, explaining that the language actually originated from Jacob and requires loss of competency, comprehension or will of

20

a magnitude that would excuse conduct that is otherwise knowing or purposeful.  (Citing In re Steinhoff, 114 N.J. 268, (1989)).  Most specifically, the Court in In re Roth, 140 N.J. 430, 448 (1995), addressed mental illness in the context of whether an attorney lacked volitional capacity to perform his duties.  The Court equated the loss of competency, comprehension or will as requiring an inability to distinguish right from wrong and concluded that the depression from which the respondent was suffering did not suffice to excuse his conduct under that standard.  Ibid.

In another case, Greenberg, supra, 155 N.J. 138, our Court was asked to consider whether depression caused the respondent to suffer a substantial impairment of judgment that, when combined with other mitigating factors, should permit the attorney to avoid disbarment for stealing law firm funds.  In rejecting the defense, our Court tied its rationale again to the lawyer's failure to demonstrate that "he was unable to appreciate the difference between right and wrong or the nature and quality of his acts."  Id. at 157.  The lawyer's mental illness, although severe, did not eviscerate the lawyer's knowledge that he was taking the firm's funds and that his firm had not authorized the taking.  Id. at 158-59; see also In re Tonzola, 162 N.J. 296, 307 (2000) (noting "the debilitating and overpowering effects of respondent's illnesses," but

21

acknowledging respondent's expert's opinion that respondent "may have been aware" that clients' funds were being misappropriated).

The DRB applied those cases to the matter at hand and concluded that the Jacob standard requires an inability to distinguish between right and wrong or to understand the nature and quality of one's acts. Those two expressions of understanding can be likened to the standard for legal insanity, under the M'Naghten test, and the standard for diminished legal responsibility under principles of diminished capacity or the statutory defense of intoxication. See N.J.S.A. 2C:4-1 (insanity); see, e.g., State v. Worlock, 117 N.J. 596, 603 (1990) ("Directed at defendant's ability to 'know,' the M'Naghten test is essentially one of cognitive impairment. Sometimes described as the 'right and wrong' test, its purpose is to determine whether the defendant had sufficient mental capacity to understand what he was doing when he committed the crime."); N.J.S.A. 2C:4-2 (diminished capacity); see, e.g., State v. Taylor, 387 N.J. Super. 55, 61-62 (App. Div. 2006) (stating that, once affirmative defense of diminished capacity is raised, State must prove beyond reasonable doubt that, despite evidence of defendant's mental disease or defect, she nonetheless "knew" that she was committing the relevant offense); N.J.S.A. 2C:2-8 (intoxication); see, e.g., State v.

22

Mauricio, 117 N.J. 402, 418 (1990) (stating that "self-induced intoxication is a defense to a purposeful or knowing crime"). The Jacob standard may not be a model of clarity, but the point to Jacob is that it expressed the Court's willingness to consider defenses that would negate the mental state to act purposely. A mental illness that impairs the mind and deprives the attorney of the ability to act purposely or knowingly, or to appreciate the nature and quality of the act he was doing, or to distinguish between right and wrong, will serve as a defense to attorney misconduct. The aforesaid defenses are ones that can and should be considered in connection with excusing wrongful conduct by an attorney, or when mitigation of the disciplinary penalty is appropriate to consider under our disciplinary jurisprudence addressing the quantum of punishment.

Indeed, Dr. Greenfield noted the same defenses in his testimony, identifying all three as potential bases for avoiding legal responsibility under the attorney disciplinary system. In his testimony, Dr. Greenfield did not limit his understanding of a Jacob defense to legal insanity, as respondent argues, although respondent's ability to distinguish right from wrong was the only one of the three possibilities that could apply to respondent's mental condition and behavior. Dr. Greenfield stated that point more than once, and even Dr. Simring testified that respondent did not meet any of those three criteria for

23

non-responsibility. There was no expert disagreement on the fact that respondent did not have a mental illness that met any of the aforesaid three defenses that negate the mental state to act knowingly.

Respondent persists in maintaining that the DRB and the OAE mistakenly limit the Jacob standard to presentation of a successful insanity defense in a criminal matter and that nothing more will be considered. While we agree that the Jacob standard is not restricted to making a showing that is equivalent to the M'Naghten standard for legal insanity under criminal law, we reject respondent's contention that the DRB's decision in this matter is undermined by its focus on the legal insanity standard as that was the only one of the three possible defenses that pertained in respondent's situation.

The DRB properly analyzed the record presented by respondent and his expert as well as the testimony provided by the OAE's expert. In our view, the DRB correctly concluded that the OAE has proven knowing misappropriation by clear and convincing evidence. Respondent did not demonstrate legal excuse for his misappropriations. Moreover, in light of the pattern and timing of respondent's misappropriations and concealment well after having received care and ongoing treatment, we conclude that his misdeeds were not aberrational. This Court has previously noted the importance of establishing a

24

causal connection between mental illness and the acts of misappropriation.  See Jacob, supra, 95 N.J. at 137.  Respondent has not proven an excusing causal connection.

Nor are we persuaded that he is entitled to mitigation of the normal penalty of disbarment for his knowing, volitional, and purposeful acts of misappropriation of client and escrow funds.  We reach that conclusion, notwithstanding Dr. Simring's testimony urging that mitigation consideration be given to respondent due to his severe depression.  In our disciplinary cases, we have not allowed mitigation from disbarment in misappropriation cases.  This case does not present reason for us to start here.  In Wilson, supra, we explicitly stated that "maintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases.  That confidence is so important that mitigating factors will rarely override the requirement of disbarment."  81 N.J. at 461.  We also have been unswayed by the assertion that a respondent is unlikely to continue to misappropriate funds in the future.  "[T]he unlikelihood of subsequent misappropriation [is] irrelevant in these cases."  Id. at 460 n. 4.  This Court has not suggested that a low risk of re-offense is, in itself, "sufficient to warrant lesser discipline," because it is "almost universally present in these matters."  Ibid.

25

We are satisfied that, on this record, as amplified by the supplemental decision of the DRB, respondent committed knowing misappropriation. We adopt the recommendation of the DRB that respondent be disbarred.

IV.

In the end, notwithstanding his being allowed to practice after his tax evasion conviction, respondent's misappropriation has been proven by clear and convincing evidence. The penalty for that misconduct is disbarment.

JUSTICES LaVECCHIA, ALBIN, and PATTERSON, and JUDGES CUFF and FUENTES (both temporarily assigned) join in this PER CURIAM opinion. CHIEF JUSTICE RABNER and JUSTICES FERNANDEZ-VINA and SOLOMON did not participate.

26

SUPREME COURT OF NEW JERSEY

NO.   D-151                          SEPTEMBER TERM 2013

APPLICATION FOR _____

DISPOSITION ___Order to Show Cause Why Respondent Should___
                ___Not be Disbarred or Otherwise Disciplined___


IN THE MATTER OF

FRANK J. COZZARELLI,

An Attorney at Law


DECIDED _____May 2, 2016_____

OPINION BY _____Per Curiam_____

CONCURRING OPINION BY _____

DISSENTING OPINION BY _____

| CHECKLIST | DISBAR | |
|---|---|---|
| CHIEF JUSTICE RABNER | ----------------- | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | ----------------- | |
| JUSTICE SOLOMON | ----------------- | |
| JUDGE CUFF (t/a) | X | |
| JUDGE FUENTES (t/a) | X | |
| TOTALS | 5 | |

IN THE MATTER OF

            :

FRANK J. COZZARELLI,

            :

AN ATTORNEY AT LAW

            :

(Attorney No. 021501977)

            :

**FILED** O R D E R

MAY 02 2016

*[signature]* CLERK

It is ORDERED that **FRANK J. COZZARELLI** of **BELLEVILLE**, who was admitted to the bar of this State in 1977, be disbarred, effective immediately, and that his name be stricken from the roll of attorneys; and it is further

ORDERED that **FRANK J. COZZARELLI** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **FRANK J. COZZARELLI** comply with Rule 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that all funds, if any, currently existing or hereinafter deposited in any New Jersey financial institution maintained by **FRANK J. COZZARELLI** pursuant to Rule 1:21-6 be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund pending the further Order of this Court; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs and actual expenses incurred in the prosecution of this matter, as provided in Rule 1:20-17.


WITNESS, the Honorable Jaynee LaVecchia, Presiding Justice, at Trenton, this 2nd day of May, 2016.

CLERK OF THE SUPREME COURT

The foregoing is a true copy of the original on file in my office.

CLERK OF THE SUPREME COURT
OF NEW JERSEY