SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**In the Matter of Dionne Larrel Wade (D-132-20) (085931)**

**Argued September 27, 2021 -- Decided June 7, 2022**

**RABNER, C.J., writing for a unanimous Court.**

In this disciplinary matter, the Court is asked to revisit the rule imposed in In re Wilson, which calls for automatic disbarment of attorneys who knowingly misappropriate client funds. 81 N.J. 451, 453, 461 (1979).

Respondent Dionne Larrel Wade has been a solo practitioner since she was admitted to the New Jersey bar in 2002. Her remarkable personal and professional accomplishments are clear from the record. She overcame obstacles early in life and persevered with her studies. Throughout her legal career, she volunteered her time and skill and provided pro bono legal services to underserved clients. She also conducted free legal clinics at her church. She has no prior disciplinary history.

In June 2017, the Office of Attorney Ethics (OAE) conducted a random audit of her financial records. The audit identified multiple problems, including commingling and extensive shortages in client trust funds. Ultimately, the allegations against Respondent involved three clients. She conceded she used client funds without permission to pay various expenses but claimed she did not know it was wrong to borrow the money until the OAE investigator told her so.

In one matter, Respondent repeatedly transferred client funds from her attorney trust account to her business account, which created a shortfall of more than $11,000. Respondent later deposited $12,000 borrowed from a friend to cover the shortfall. In the second matter, Respondent admitted borrowing $5,000 without permission but stated that she withdrew $3,000 to hire a detective for the case and returned that money when she decided not to proceed, while $2,000 was for her fee. In the third matter, Respondent made a number of withdrawals from $4,000 she held in escrow for a client, and the balance dropped to $3,750 at one point. Respondent asserted the shortfalls resulted from failure to pay attention to the books. She replenished the money in time for the closing. In the end, none of Respondent's clients lost money.

1

Respondent explained that she was aware of the danger in borrowing from clients, noting she had not touched another $123,000 in client funds because she knew she could not "pay that back." Respondent drew the line at $12,000 -- a self-imposed limit. Respondent admitted that she considered client funds as a "line of credit" she could use, without permission, as long as she made the client whole. She further admitted to using funds from one client to pay for another client's needs but claimed she did not know that was improper. At various times, Respondent explained that she never intended to steal from clients and intended to pay the money back at all times.

The OAE charged Respondent with multiple instances of knowingly misappropriating client and escrow funds, with violating several Rules of Professional Conduct (RPCs), and with various recordkeeping violations. After a hearing, a Special Ethics Master found that "sloppy bookkeeping did not cause [Respondent] to unknowingly borrow client funds. She knowingly did so, and she paid back what she borrowed." Because he found clear and convincing evidence that Respondent knowingly misappropriated funds entrusted to her, the Special Master recommended that Respondent be disbarred under <u>Wilson</u> and RPC 1:15(a). After a de novo review of the record, the Disciplinary Review Board (DRB) unanimously upheld the Special Master's findings and recommendation in a comprehensive decision. The Court entered an order to show cause.

**HELD:** *In the four decades since <u>Wilson</u>, the Court has consistently disbarred attorneys who knowingly misappropriated client funds regardless of their motives or other mitigating factors. The rule has remained inviolate because of the critical aims it seeks to serve: to protect the public and maintain confidence in the legal profession and the Judiciary. 81 N.J. at 461. If a lawyer knowingly misappropriates client funds, both the attorney and the public should know that the person will be disbarred.

*Because the record in this case -- including Respondent's admissions -- clearly and convincingly demonstrates that she knowingly misappropriated client and escrow funds, the Court will enter an order of disbarment. Under New Jersey's longstanding disciplinary rules, disbarment is permanent and marks the end of a person's ability to practice law. In that respect, New Jersey's approach differs from most jurisdictions.

*Although it declines to revisit the <u>Wilson</u> rule, the Court finds it is time to reevaluate the current approach to <u>permanent</u> disbarment. The question -- and the challenge -- is whether and how to create a rigorous system that can determine if a lawyer disbarred for those reasons deserves a second chance years later. The Court will establish a broad-based committee to analyze whether disbarment for knowing misappropriation should continue to be permanent, or

2

whether New Jersey should join the majority of jurisdictions that allow for reinstatement. If the Court revises the current approach to permanent disbarment, Respondent and others would be able to reapply for admission in accordance with a new court rule.

1. Prior to 1979, the Court condemned the taking of client funds but did not disbar lawyers in all cases. The Court's pronouncement in Wilson in 1979 outlined a clearer path: "that disbarment is the only appropriate discipline" when an attorney "knowingly use[s] his clients' money as if it were his own." 81 N.J. at 453. As the Court explained, most "misappropriation cases involve[] lawyers who undoubtedly intended to return the funds." Id. at 458. The Court nonetheless observed that "[t]he policy described in this opinion, leading to disbarment in these cases, would be ill served if 'borrowing' regularly resulted in lesser discipline." Id. at 458 n.2. In essence, although the Court sharply criticized "stealing a client's money," id. at 457, it did not require proof that an attorney intended to steal or defraud a client to establish knowing misappropriation. The Court went on to consider -- and reject -- mitigating circumstances that had previously led to discipline short of disbarment, including restitution and recordkeeping. Id. at 457-59. The Court noted that "the pressures on the attorney that forced him to steal, and the very real possibility of reformation" are deeply troubling in ordering disbarment, but it found those factors to be outweighed by the "most compelling reasons" -- "the continued confidence of the public in the integrity of the bar and the judiciary." Id. at 460. As a result, the Court announced a bright-line rule that "all . . . cases" of knowing misappropriation of client funds "generally . . . shall result in disbarment. We foresee no exceptions to this rule and expect the result to be almost invariable." Id. at 453. "[M]itigating factors will rarely override the requirement of disbarment." Id. at 461. That rule has been described in even stronger language in decisions since Wilson. (pp. 17-22)

2. After Wilson, the Court extended the disbarment rule to lawyers who knowingly misuse escrow funds. In re Hollendonner, 102 N.J. 21, 28 (1985). Knowing misappropriation of law firm funds can lead to disbarment, but disbarment has not been an absolute requirement in those instances. In re Sigman, 220 N.J. 141, 158 (2014). In all of those areas, the Court imposes disbarment only if the OAE can satisfy a high standard and demonstrate clear and convincing proof of knowing misappropriation. Attorneys who negligently misappropriate client funds are not subject to Wilson's automatic disbarment rule. In re Noonan, 102 N.J. 157, 160-61 (1989). Here, cases involving negligent misappropriation are not relevant because Respondent, by her own admissions, deliberately used client and escrow funds without permission. (pp. 22-23)

3. In the decades since Wilson, despite occasional criticism, the Court has declined to relax or modify the bright-line rule that knowing misappropriation will result in disbarment. Case law also reveals that the Court has continued to reject various

3

defenses to the <u>Wilson</u> rule. On multiple occasions, for example, the Court has stated that intent to steal funds from a client is not an element of knowing misappropriation. Instead, the Court has held that knowing misappropriation consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking. An attorney's motive for taking client funds -- good or bad -- is not relevant. Just the same, an intent to return a client's money is irrelevant. Nor is willful blindness a defense to a charge of knowing misappropriation. Ignoring mail that contains financial records cannot provide attorneys a safe haven, and it is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds. Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds. Similarly, ignorance of ethics rules and case law does not excuse ethical misconduct. Personal and financial hardship also cannot excuse a lawyer who takes a client's funds. (pp. 23-26)

4. Respondent advanced a number of such defenses, but none of them can overcome <u>Wilson</u>'s bright-line rule. The Court makes clear once again that knowing misappropriation will lead to disbarment. When clients place money in an attorney's hands, they have the right to expect the funds will not be used intentionally for an unauthorized purpose. If they are, clients can confidently expect that disbarment will follow. Because there is clear and convincing evidence in the record, including Respondent's own admissions, that she knowingly took client and escrow funds without permission on multiple occasions, an order of disbarment will be entered. (pp. 26-27)

5. At the hearing before the Special Master, Respondent presented multiple character witnesses who offered compelling evidence of her personal and professional achievements. Based on that testimony, the Special Master found that "[h]er service to the community and good reputation are particularly exemplary." The DRB similarly observed that "Respondent is a remarkable person who has overcome tremendous personal obstacles . . . to become a pillar of her church and local community and what appeared to be an excellent member of the New Jersey bar." The Court agrees with those conclusions and recounts some of the testimony underlying them, including by one of the clients whose funds were invaded. As the Special Master and the DRB recognized, Respondent has no prior disciplinary history. None of her clients lost money, and she promptly took remedial measures after the random audit. She cooperated with the OAE, readily admitted she borrowed clients' money without permission, and was contrite about her failure to maintain financial records properly. Although Respondent's personal and professional history does not provide a defense to a <u>Wilson</u> violation, her accomplishments raise important questions about New Jersey's longstanding system of attorney discipline. In particular, should disbarment be <u>permanent</u> in all <u>Wilson</u>

4

cases?  Or should the disciplinary system offer disbarred attorneys like Respondent an opportunity for a second chance at a later point in time?  (pp. 27-31)

6.  All 50 states and the District of Columbia disbar attorneys who commit serious ethical violations.  In a large majority of jurisdictions, however, disbarment is not permanent.  Altogether, 41 states plus the District of Columbia allow attorneys to apply to be reinstated after they have been disbarred, and 31 of those jurisdictions permit attorneys to apply for readmission 5 years after disbarment.  The majority rule is consistent with a recommendation by the American Bar Association, which also proposes criteria for reinstatement, including compliance with all prior disciplinary orders; rehabilitative treatment for physical or mental infirmity, including alcohol or drug abuse; recognition of the wrongfulness and seriousness of the prior misconduct; proof of the requisite honesty and integrity to practice law; competency to practice; and passage of the bar examination and character and fitness examination.  Many states outline similar factors to assess whether a disbarred attorney should be reinstated.  Sixteen states require petitioners to complete examination requirements as part of the reinstatement process, and several reserve the option to do so on a case-by-case basis.  (pp. 31-37)

7.  To assess those and other factors, the Court will convene a committee comprised of attorneys as well as members of the public who are not lawyers.  The committee will study whether disbarment should continue to be permanent in all Wilson cases and will recommend standards that might apply if New Jersey were to adopt the majority approach.  Among other issues to consider are the following:  After what period of time might attorneys be readmitted?  What factors and standard of proof should apply to that judgment?  Should disbarred attorneys be required to retake the bar examination or other courses on ethics, recordkeeping, and related subjects?  What process might be adopted for readmission?  And what rule changes might be warranted?  The Court provides guidance as to the scope of the committee's work and notes that the committee's report will be made available to the public for comment before the Court determines how to proceed.  The Court welcomes input from attorneys and the public to promote the key interests at the heart of the Wilson rule:  how best to protect the public and maintain confidence in the legal profession. (pp. 37-38)

**An order of disbarment is entered.**

**JUSTICES ALBIN, PATTERSON, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.  JUDGE FUENTES (temporarily assigned) did not participate.**

In the Matter of
Dionne Larrel Wade,
An Attorney at Law.

On an Order to Show Cause
why respondent should not be disbarred or
otherwise disciplined.

| Argued | Decided |
|--------|---------|
| September 27, 2021 | June 7, 2022 |

HoeChin Kim, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics (Ryan J. Moriarty, Deputy Ethics Counsel, on the brief).

Donald M. Lomurro argued the cause for respondent (Lomurro, Munson, Comer, Brown & Schottland, attorneys; Donald M. Lomurro and Christina Vassiliou Harvey, of counsel and on the brief).

Robert B. Hille argued the cause for amicus curiae New Jersey State Bar Association (New Jersey State Bar Association, attorneys; Domenick Carmagnola, President, of counsel, and Robert B. Hille and Abdus-Sami M. Jameel, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This attorney disciplinary matter involves a clear case of knowing misappropriation of client and escrow funds. From 2002 to 2017, Respondent

1

Dionne Larrel Wade knowingly and repeatedly borrowed money from clients, without their knowledge or approval, to cover the needs of other clients and for her personal use. During a random audit conducted by the Office of Attorney Ethics (OAE), Respondent admitted she transferred funds from her trust account because she needed the money to cover personal and business expenses. She represented that she never intended to steal the funds and had returned all the money. No clients were harmed.

Ms. Wade's remarkable personal and professional accomplishments are also clear from the record. She overcame obstacles early in life and persevered with her studies. Throughout her legal career, she volunteered her time and skill and provided pro bono legal services to underserved clients. She also conducted free legal clinics at her church. She has no prior disciplinary history.

Respondent and the State Bar Association ask the Court to revisit the rule imposed in In re Wilson, which calls for automatic disbarment of attorneys who knowingly misappropriate client funds. 81 N.J. 451, 453, 461 (1979). Respondent suggests that mitigating factors be considered when no client is harmed. The State Bar submits that proof of intent to steal or defraud should be required to establish that an attorney knowingly misappropriated client or escrow funds.

2

This Court has long recognized that "[t]here are few more egregious acts of professional misconduct of which an attorney can be guilty than misappropriation of a client's funds held in trust." Id. at 455 (quoting In re Beckmann, 79 N.J. 402, 404-05 (1979)). In the four decades since Wilson, the Court has consistently disbarred attorneys who knowingly misappropriated client funds regardless of their motives or other mitigating factors. The rule has remained inviolate because of the critical aims it seeks to serve: to protect the public and maintain confidence in the legal profession and the Judiciary. See id. at 461. If a lawyer knowingly misappropriates client funds, both the attorney and the public should know that the person will be disbarred.

Because the record in this case -- including Respondent's admissions -- clearly and convincingly demonstrates that she knowingly misappropriated client and escrow funds, the Court will enter an order of disbarment.

Under New Jersey's longstanding disciplinary rules, disbarment is permanent and marks the end of a person's ability to practice law. In that respect, our approach differs from most jurisdictions. Forty-one states and the District of Columbia allow disbarred attorneys to apply to be reinstated to the bar -- most of them after 5 years.

Although we decline to revisit the Wilson rule, we believe it is time to reevaluate the current approach to permanent disbarment. To be clear, lawyers

3

will still be disbarred in all matters in which they knowingly misappropriate client or escrow funds, consistent with decades of precedent.  The question -- and the challenge -- is whether and how to create a rigorous system that can determine if a lawyer disbarred for those reasons deserves a second chance years later.

Many considerations would likely factor into that type of decision, including the nature and seriousness of the misconduct, whether the person honestly accepts that their prior behavior was wrong, the extent of any rehabilitation, how much time has passed, whether the individual possesses the necessary integrity to practice law, and whether readmission would compromise public confidence in the bar, among other criteria.

Under any such system, it is unlikely that attorneys who stole from clients and caused substantial harm could ever be trusted to practice law again. On the other end of the spectrum, lawyers who knowingly misappropriated client funds while suffering from addiction, mental health issues, or great personal challenges; who did not cause harm; and who have been rehabilitated, might prove worthy of having their license restored at a later date.  In between those examples lie many other scenarios, to be sure.

The Court will establish a broad-based committee to analyze whether disbarment for knowing misappropriation should continue to be permanent, or

4

whether New Jersey should join the majority of jurisdictions that allow for reinstatement. We will ask lawyers and members of the public who are not attorneys to serve on the committee and present recommendations on an expedited basis. The committee's report will be made available for public comment before the Court decides whether and how to act.

Foremost in our mind is the need to protect the public, to retain its confidence in the legal profession, and to promote the integrity of the bar. If the Court revises the current approach to permanent disbarment, Ms. Wade and others would be able to reapply for admission in accordance with a new court rule.

## I.

To summarize the facts, we draw from the record before the Special Ethics Master, his detailed report, and the comprehensive decision of the Disciplinary Review Board (DRB).

## A.

Respondent has been a solo practitioner since she was admitted to the New Jersey bar in 2002. On June 15, 2017, the OAE conducted a random audit of her financial records. The day before, Respondent deposited $12,000 she borrowed from a friend into her attorney trust account.

The audit covered two years, from mid-2015 to mid-2017, and it identified multiple problems. They included commingling and extensive shortages in client trust funds totaling more than $11,000. In response to the audit, Respondent admitted that she borrowed client and escrow funds in two matters, without permission from her clients, because she needed money and had no one else to turn to for a loan. She explained what happened in a letter she wrote and sent the OAE dated August 14, 2017:

> Regarding my trust account being out-of-trust please be advised of the following:
>
> Without the knowledge or permission of two (2) of my clients, Rev. Milena Eason and the Estate of Felix Anderson, I borrowed money, resulting in the two (2) accounts being out of trust for a time.
>
> As your office is aware, Rev. Milena Eason entrusted twenty-one thousand dollars [$21,000] in my care. Upon doing so, I placed the funds in my trust account. Though I did not immediately begin to borrow the funds, as money became low in my business, I transferred funds from my trust account to my attorney general/business account. At no time did I ever intend to keep or steal Rev. Eason's money. Not only did I intend to return the funds; but, the funds were actually returned to the account. I had no idea that my actions would spark disciplinary proceedings.
>
> In addition, I borrowed money from my client, the Estate of Felix Anderson. In August 2016, I borrowed approximately five thousand dollars [$5,000] from the Estate account . . . .

6

As stated previously, I had no idea my actions were wrong or that they would spark disciplinary proceedings. I never intended to steal or keep these funds. Not only did I intend to return the funds; but, here too the funds were actually returned to the account . . . .

I work earnestly to run what I believe is a law firm of integrity based on my Christian values. I strive to give my clients good value for their dollar and the best service. This comes at a cost because my clients are sometimes slow to pay. Unfortunately, there was no-one I could turn to for a loan . . . . My point is . . . there was no one else to turn to, so I borrowed the funds. I had no idea that I could be disciplined for my actions or that what I was doing was wrong.

Once the auditor told me the effect of my actions, I had to deal with the guilt, embarrassment and shame. I spent many sleepless nights crying and praying. I told my family, friends, colleagues and my pastor. . . .

I also had to bear the embarrassment and shame of telling my clients . . . about my actions. They were understanding, compassionate and unexpectedly supportive. One colleague requested I have her represent me. . . .

I am now aware that I broke faith with my clients, family, the bar and most importantly with God. My prayer is that at some point, I can work to restore that faith. There is no excuse for my actions. I was placed in a position of trust and I violated said trust. . . . I have learned from my mistakes. Chiefly, I am not alone and I don't have to borrow from client funds. . . . In the end, I am held accountable and required to answer for my mistakes. . . .

> I request this Office take the aforementioned into consideration in taking any possible disciplinary action at the completion of this random audit.

The OAE continued with the audit and later extended the scope of its review to seven years.

## B.

The allegations against Respondent involved three clients: Reverend Eason and the Grace of God Church in Paterson; the estate of Felix Anderson; and Vivian Clayton. To provide relevant background, we briefly summarize the allegations contained in the OAE's complaint, along with defenses Respondent later asserted.

In December 2016, Reverend Eason gave Respondent a $21,000 personal check payable to her trust account. The funds were to be held in escrow to pay down the church's property tax liability. A receipt Respondent gave Eason stated, "[m]oney held in escrow for the City of Paterson . . . sum held: $21,000."

In the following months, Respondent repeatedly transferred funds from her attorney trust account to her business account, which created a shortfall of $11,636.53. Respondent later claimed she negligently used the funds, without a basic understanding of accounting principles, and thought they were earned

8

fees.  As noted earlier, she deposited $12,000 the day before the random audit began to cover the shortfall.

In the Anderson matter, Respondent held money in escrow for an estate. She admitted borrowing a total of $5,000 without permission.  About two years later, she returned $3,100.  On a ledger card Respondent prepared after the random audit, she noted that she borrowed the $5,000.  She later stated that the notation was inaccurate; that she withdrew $3,000 to hire a detective to locate a lost heir and returned $3,100 when she decided not to do so; and that she took $2,000 for her fee.  Respondent also claimed she overpaid two beneficiaries about $1,000 each.

In the third matter, Respondent represented Vivian Clayton, the seller, in a real estate transaction.  Respondent accepted $4,000 from the buyers in June 2014 and was obligated to hold the funds in escrow until the closing the next month.  Without permission, she made a number of withdrawals, transfers, and deposits in the intervening time, and the escrow balance dropped to $3,750 at one point.  Respondent later asserted that the shortfalls resulted from her failure to pay attention to the books.  She replenished the money -- to exactly $4,000 -- in time for the closing.

C.

During the course of the continuing audit, Respondent made additional admissions to the OAE.

At an interview on September 17, 2017, when asked whether she had ever borrowed escrow funds from a client, she responded, "Yes. That's why we're here, aren't we?" In connection with the Anderson estate, she again admitted that she borrowed escrow funds to pay bills because she was "broke." She conceded she used client funds without permission to pay various expenses but claimed she did not know it was wrong to borrow the money until the OAE investigator told her so.

At the same interview, Respondent also admitted she took more than $11,000 from her trust account in connection with the Eason matter. At first, she claimed she replenished the funds with $12,000 from a fee she had earned. She then acknowledged, to "be open and honest," that she made up the shortfall with funds she borrowed from a friend.

Respondent added that she was aware of the danger in borrowing from clients. She noted, for example, that she had not touched another $123,000 in client funds because she knew she could not "pay that back." Respondent drew the line at $12,000 -- a self-imposed limit.

In an interview on April 11, 2018, with counsel present, Respondent admitted that she considered client funds as a "line of credit" she could use, without permission, as long as she made the client whole. Based on what she knew at the time of the interview, she conceded that her use of client funds was "absolutely" wrong but stemmed from "ignorance."

During a follow-up interview on May 16, 2018, with counsel present, Respondent admitted using funds from one client to pay for another client's needs -- known as "lapping," see In re Brown, 102 N.J. 512, 514-15 (1986) -- but claimed she did not know that was improper.

At various times, Respondent explained that she never intended to steal from clients and intended to pay the money back at all times.

D.

The OAE filed a two-count complaint on December 18, 2018. Count One charged Respondent with multiple instances of knowingly misappropriating client and escrow funds in violation of Wilson, 81 N.J. 451, In re Hollendonner, 102 N.J. 21 (1985), and RPC 1.15(a). The instances are outlined above. The first count also asserted that Respondent violated other rules of professional conduct. Count Two charged Respondent with various recordkeeping violations, contrary to RPC 1.15(d).

11

In Respondent's answer to the complaint, she moved away from some of her earlier admissions. She admitted that she "did not maintain the appropriate recordkeeping procedures" but denied having "commit[ted] a knowing misappropriation." Respondent stated that she "did not intentionally take client funds." Although she conceded she had made certain admissions, she "denied that what was stated is actually what occurred." She also asserted that her prior statements to the OAE "were made due to [her] embarrassment over not having maintained proper records in [her] practice." Respondent's answer also summarized her personal history, pro bono work, and other involvement in the community.

A Special Ethics Master conducted a hearing on October 29 and 30, and November 6, 2019. The OAE auditor and Respondent testified and presented information that is summarized above. An expert witness and multiple character witnesses also testified on Respondent's behalf. The witnesses presented compelling evidence of Respondent's personal character, which we recount later. One witness also described the "disarray" in Respondent's law office; she saw "a hundred plus unopened envelopes" that contained financial records and tried to help Respondent organize them. Respondent herself admitted that she let bank statements pile up without opening them.

12

In a post-hearing submission, Respondent again distanced herself from her earlier admissions. She claimed that any misappropriations were negligent, not knowing; that her bookkeeping practices were deficient and accounted for various errors and shortfalls; that she believed she transferred earned legal fees and not Reverend Eason's money; that the notation she had "borrowed" funds in the Anderson matter was inaccurate; and that she was ignorant of "checking accounting principles" and recordkeeping rules. The OAE countered Respondent's arguments and recommended that she be disbarred for knowing misappropriation of trust and escrow funds.

The Special Master issued a thorough report in February 2020 that recommended disbarment. He observed that Respondent lacked "any experience in basic financial management" and "was unaware of her professional obligations with regard to financial record keeping." He found that Respondent "regularly and intentionally commingled her personal and trust funds," kept fees in her attorney trust account, and "withdrew them to meet personal and business expenses."

The Special Master noted that Respondent's "improper practice caused [her] to be repeatedly out of trust which she thought [was] excusable so long as she made up the shortage when needed." Moreover, her conduct made "it clear that she knew she made use of client funds, as opposed to her own money."

The Special Master found Respondent "repeatedly paid back what she 'borrowed'" and appeared to limit her misappropriations to not more than $12,000 at any one time.

He discounted expert testimony that Respondent's poor recordkeeping and commingling of funds meant "she could not have known she was using client funds." To the contrary, the Special Master found that her "repeated and consistent repayment of all amounts borrowed" belied the testimony. The Special Master made note of Respondent's "conscious return of borrowed funds in time to cover any shortfalls." In his words, "sloppy bookkeeping did not cause [Respondent] to unknowingly borrow client funds. She knowingly did so, and she paid back what she borrowed."

The Special Master made specific findings of knowing misappropriation in the Eason, Anderson, and Clayton matters. He also canvassed relevant case law related to the Wilson rule and made findings on the remaining RPC violations. Because he found clear and convincing evidence that Respondent knowingly misappropriated client and escrow funds entrusted to her in all three client matters, he recommended that Respondent be disbarred under Wilson and RPC 1:15(a).

E.

In June 2021, after a de novo review of the record, the DRB unanimously upheld the Special Master's findings and recommendation in a comprehensive, sixty-one-page decision.

Like the Special Master, the DRB acknowledged Respondent was "a remarkable person who ha[d] overcome tremendous personal obstacles, through diligence and perseverance, to become a pillar of her church and local community." The Board also reviewed the testimony of Respondent's character witnesses in detail.

Despite evidence of her "stellar personal reputation," however, the DRB found the record was "replete with overwhelming evidence that she repeatedly and knowingly misappropriated client and escrow funds, from 2002 through 2017." The DRB also pointed to Respondent's multiple admissions that she "borrowed client and escrow funds, for the entirety of her career, and specifically in the Eason and Anderson Estate matters, 'without the knowledge or permission' of her clients." According to the DRB, "Respondent's behavior constituted textbook 'lapping,'" -- "'robbing Peter to pay Paul,' but always making certain that 'Peter's funds' were replenished when it was time to repay" him.

The DRB recited Respondent's admissions in detail, noted her attempt "to distance herself from" them, and "view[ed] that sea change with skepticism." The Board also addressed and rejected defenses that she raised. It found that neither an intent to replace client funds nor ignorance of the ethics rules was a defense to a Wilson violation. The Board equated Respondent's lack of an accounting system for fifteen years with willful blindness. In the end, the DRB concluded that "disbarment is the only appropriate sanction, pursuant to the principles of Wilson and Hollendonner." The Board therefore did not address the appropriate discipline for other ethical violations it found.

F.

We entered an order to show cause. The OAE, Respondent, and the New Jersey State Bar Association, as amicus curiae, appeared at oral argument.

II.

Respondent and the OAE renew arguments they presented to the Special Master and the DRB. Respondent contends she did not intentionally misappropriate client funds, that the record reflects instances of negligent misappropriation, and that, even if knowing misappropriation is found, she should not be disbarred. She argues the Wilson rule should be reevaluated when "no client is harmed and the mitigating factors clearly outweigh

16

imposition of disbarment." The OAE counters that Respondent knowingly misappropriated client and escrow funds and offered no persuasive defenses, and that neither her conduct nor her background justify revising the Wilson rule.

The State Bar Association asks the Court to clarify the Wilson rule and find that the knowledge element of misappropriation "is tantamount to an intent to steal or defraud the person from whom . . . funds are taken." In other words, the Bar submits that under Wilson and its progeny, knowing misappropriation of client or escrow funds should require proof that an attorney intended to steal or defraud.

## III.

We begin our analysis with an overview of the Court's seminal ruling in In re Wilson as well as relevant caselaw before and after the decision.

## A.

Prior to 1979, the Court condemned the taking of client funds but did not disbar lawyers in all cases. Beckmann, 79 N.J. at 405. Most attorneys either were disbarred or resigned with prejudice. David E. Johnson, Lawyer, Thou Shall Not Steal, 36 Rutgers L. Rev. 454, 460-74 (1984). But the Court's consideration of mitigating factors -- restitution, economic and emotional pressures, candor and cooperation, remorse, later compliance with trust

17

account requirements, and other circumstances -- led to varied outcomes.  See

Wilson, 81 N.J. at 455-56; James R. Zazzali, The Whys and Hows of

Permanent Disbarment:  New Jersey's Wilson Rule, 21 Geo. J. Legal Ethics

311, 313 (2008); see also Annotated Standards for Imposing Lawyer Sanctions,

Standard 9.32 (Ellyn S. Rosen ed., ABA 2d ed. 2019) (compiling mitigating

factors).

In the years leading up to the Wilson decision, discipline for knowing

misappropriation ranged from a suspension to disbarment.  See, e.g., In re

Rabb, 73 N.J. 272, 279, 281 (1977) (six-month suspension); In re Ritger, 80

N.J. 1, 3-4 (1979) (two-year suspension); In re Hickey, 69 N.J. 69, 70-71

(1976) (three-year suspension); Beckmann, 79 N.J. at 404-05 (indefinite

suspension); In re Bierman, 62 N.J. 91, 93 (1973) (disbarment); In re Ditri, 71

N.J. 173, 174 (1976) (disbarment); In re Metro, 72 N.J. 143, 144 (1977)

(disbarment); see also Zazzali, 21 Geo. J. Legal Ethics at 313-15 (discussing

cases).  In short, New Jersey's prior approach to disciplining attorneys who

misappropriated client funds was "unpredictable" and "uneven."  Zazzali, 21

Geo. J. Legal Ethics at 313.

The Court's pronouncement in Wilson in 1979 outlined a clearer path:

"that disbarment is the only appropriate discipline" when an attorney

"knowingly use[s] his clients' money as if it were his own."  81 N.J. at 453.

18

Wendell Wilson was the subject of eight disciplinary complaints; two involved misappropriation. In one matter, Wilson failed to turn over to a client, for nearly two years, more than $23,000 from the sale of a house. Ibid. In the second, Wilson forged his client's endorsement on a $4,300 check payable to the client and deposited the check in his trust account. Ibid. Wilson did not turn over the funds.

The Court noted that misappropriation of client funds is a crime as well as a violation of the ethics rules. Id. at 454. Yet the principle announced in Wilson plainly extended beyond theft and criminality. The Court defined "misappropriation" as "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." Id. at 455 n.1. The Court also expressly stated that "[c]riminality is not determinative." Id. at 458 n.2.

As the Court explained, most "misappropriation cases involve[] lawyers who undoubtedly intended to return the funds." Id. at 458. The Court nonetheless observed that "[t]he policy described in this opinion, leading to disbarment in these cases, would be ill served if 'borrowing' regularly resulted in lesser discipline." Id. at 458 n.2. In essence, although the Court sharply criticized "stealing a client's money," id. at 457, it did not require proof that

19

an attorney intended to steal or defraud a client to establish knowing misappropriation.

The Court went on to consider -- and reject -- mitigating circumstances that had previously led to discipline short of disbarment. Restitution, the defense raised most frequently, often depended on a person's ability to pay and not "moral fitness." Id. at 457-58 (quoting In re Harris, 88 N.J.L. 18, 22-23 (Sup. Ct. 1915) (en banc)). As the Court noted, "[a] thoroughly bad man may make restitution, if he is able, . . . and a thoroughly good man may be unable to make any restitution at all." Id. at 457 (quoting Harris, 88 N.J.L. at 22).

The Court found that improved recordkeeping was a "similarly unpersuasive" factor because lawyers are expected "to set up proper books and records" and keep their trust accounts in balance. Id. at 459. "[I]nexperience" or an "outstanding career" also "seem[] less important" when "misappropriation is involved." Id. at 459-60. The Court explained that the "offense against common honesty should be clear even to the youngest; and to distinguished practitioners, its grievousness should be even clearer." Id. at 460.

The Court recognized that two factors "must deeply trouble any court" that orders disbarment: "the pressures on the attorney that forced him to steal, and the very real possibility of reformation." Ibid. Disbarment under those

circumstances, the Court noted, "is so terribly harsh as to require the most compelling reasons to justify it." Ibid.

The Court articulated the compelling reasons in plain terms: "the continued confidence of the public in the integrity of the bar and the judiciary." Ibid. If that "confidence is destroyed," the Court stated, "the bench and the bar will be crippled institutions." Id. at 461.

As a result, the Court announced a bright-line rule that "all . . . cases" of knowing misappropriation of client funds "generally . . . shall result in disbarment. We foresee no exceptions to this rule and expect the result to be almost invariable." Id. at 453. "[M]itigating factors will rarely override the requirement of disbarment." Id. at 461.

More recently, the Court has used even stronger language to describe the rule. See, e.g., In re Orlando, 104 N.J. 344, 350 (1986) ("Disbarment is mandated for the knowing misappropriation of clients' funds . . . ."); In re Konopka, 126 N.J. 225, 228 (1991) ("[W]e have not retreated one bit from the principle that knowing misappropriation, when shown by clear and convincing evidence, will warrant the Wilson sanction of disbarment."); In re Greenberg, 155 N.J. 138, 148 (1998) ("[S]ince Wilson, the Court has consistently and unwaveringly disbarred attorneys who knowingly took their clients' funds."); In re Cozzarelli, 225 N.J. 16, 28 (2016) ("[A]n attorney who knowingly

21

misappropriates funds from a client is subject to disbarment without any practical prospect of consideration of mitigating factors . . . ." (citations omitted)).

After Wilson, the Court extended the disbarment rule to lawyers who knowingly misuse escrow funds. Hollendonner, 102 N.J. at 28. Knowing misappropriation of law firm funds can lead to disbarment under In re Siegel, 133 N.J. 162, 170 (1993), and Greenberg, 155 N.J. at 140, but disbarment has not been an absolute requirement in those instances. In re Sigman, 220 N.J. 141, 158 (2014).

In all of those areas, we impose disbarment only if the OAE can satisfy a high standard and demonstrate clear and convincing proof of knowing misappropriation. Id. at 153; see also In re Barlow, 140 N.J. 191, 196 (1995) ("Proof of misappropriation, by itself, is insufficient to trigger the harsh penalty of disbarment. Rather, the evidence must clearly and convincingly prove that respondent misappropriated client funds knowingly.").

That standard cannot be met if an attorney presents "competent medical proofs that [the person] suffered a loss of competency, comprehension, or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional, and purposeful." In re Jacob, 95 N.J. 132, 137 (1984). To avoid disbarment in such a case, a respondent must establish a "causal

connection" between the alleged medical condition and the act of misappropriation. Ibid.; see also Cozzarelli, 225 N.J. at 29-33 (discussing case law and noting "the importance of establishing . . . an excusing causal connection").[1]

The Wilson rule, of course, applies to cases of knowing, not negligent, misappropriation. Attorneys who negligently misappropriate client funds are not subject to Wilson's automatic disbarment rule. In re Noonan, 102 N.J. 157, 160-61 (1989). We do not review cases of negligent misappropriation here because they are not relevant. Respondent, by her own admissions, deliberately used client and escrow funds without permission.

B.

In the decades since Wilson, despite occasional criticism, the Court has declined to relax or modify the bright-line rule that knowing misappropriation will result in disbarment. See, e.g., Konopka, 126 N.J. at 241 (Stein, J.,

---

[1] Respondents have the burden of proving medical defenses by clear and convincing evidence. R. 1:20-6(c)(2)(B); cf. R. 1:20-6(c)(2)(C) (noting respondents have "[t]he burden of going forward regarding [other] defenses or demonstrating mitigating factors"). General proof of addiction to alcohol, drugs, or gambling, or of mental illness, which falls short of the Jacob standard, is insufficient to avoid disbarment for knowing misappropriation. See, e.g., In re Hein, 104 N.J. 297, 302 (1986) (alcoholism); In re Romano, 104 N.J. 306, 309-11 (1986) (drug dependency); In re Goldberg, 109 N.J. 163, 167, 172 (1988) (compulsive gambling); In re Tonzola, 162 N.J. 296, 305 (2000) (mental illness).

23

concurring, joined by O'Hern and Garibaldi, JJ.) ("[A]lthough the Wilson rule is the right rule for the vast majority of knowing-misappropriation cases, the inflexibility with which it can be applied runs the risk of creating within our attorney-discipline system an almost reflexive approach to such cases, obscuring and ignoring the individual circumstances to an intolerable degree."); Greenberg, 155 N.J. at 164 (Stein, J., dissenting, joined by O'Hern, J.) ("The Court should exercise caution and restraint in considering the extent to which it should apply rigid, bright-line rules in attorney disciplinary proceedings. Disbarment is the most unforgiving discipline, and it condemns every lawyer on whom it is imposed to a life sentence of professional disgrace."); see also Zazzali, 21 Geo. J. Legal Ethics at 329-31, 335-39 (reviewing criticism of the Wilson rule and recommending the use of indeterminate suspension in exceptional cases).

The Court has also continued to reject various defenses to the Wilson rule. On multiple occasions, for example, the Court has stated that "[i]ntent to steal funds from a client is not an element of knowing misappropriation." In re Mininsohn, 162 N.J. 62, 72 (1999); accord Barlow, 140 N.J. at 195. In Noonan, the Court set forth the requirements for knowing misappropriation as follows: it "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not

24

authorized the taking." 102 N.J. at 160. An attorney's motive for taking client funds -- good or bad -- is not relevant. Ibid. Just the same, an intent to return a client's money is irrelevant. Ibid.; In re Pomerantz, 155 N.J. 122, 134 (1998).

Nor is willful blindness a defense to a charge of knowing misappropriation. As the Court observed in In re Johnson, "[t]he intentional and purposeful avoidance of knowing what is going on in one's trust account will not be deemed a shield against proof of what would otherwise be a 'knowing misappropriation.'" 105 N.J. 249, 260 (1987); see also In re Skevin, 104 N.J. 476, 486 (1986) (defining willful blindness). Ignoring mail that contains financial records cannot provide attorneys a safe haven.

Attorneys have also asserted poor accounting or shoddy bookkeeping as a defense. But "[i]t is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds. Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds." In re Fleischer, 102 N.J. 440, 447 (1986).

Although shoddy bookkeeping alone does not establish knowing misappropriation, it is not a defense to a Wilson violation when the record otherwise demonstrates knowing misappropriation. In re Freimark, 152 N.J.

25

45, 56 (1997); see also Skevin, 104 N.J. at 485 (disbarring attorney who commingled personal and client funds in his trust account and did not maintain adequate records but knew, based on "unavoidable inference," that his withdrawals "endanger[ed] other clients' funds").

Similarly, ignorance of ethics rules and case law does not excuse ethical misconduct. In re Berkowitz, 136 N.J. 134, 147 (1994); In re Eisenberg, 75 N.J. 454, 456 n.1 (1978).

Personal and financial hardship also cannot excuse a lawyer who takes a client's funds. The Court succinctly explained why in In re Hughes: "We do not condemn the individual who faces exigent circumstances. We do protect the public." 90 N.J. 32, 38 (1982); see also In re Roth, 140 N.J. 430, 444 (1995) (noting the Court has "repeatedly rejected opportunities 'to create exceptions to the Wilson rule, even where the misappropriation was the product of severe personal and financial hardship'" (quoting In re Warhaftig, 106 N.J. 529, 535 (1987))).

## C.

Respondent advanced a number of the defenses discussed above, but none of them can overcome Wilson's bright-line rule. Today, we make clear once again that knowing misappropriation will lead to disbarment. An

attorney who knowingly takes a client's funds without permission will be disbarred.

That approach is not meant to punish lawyers. Like the overall system of attorney discipline, it is designed to protect the public and maintain confidence in the bar and the Judiciary. Wilson, 81 N.J. at 460-61. When clients place money in an attorney's hands, they have the right to expect the funds will not be used intentionally for an unauthorized purpose. If they are, clients can confidently expect that disbarment will follow.

Because there is clear and convincing evidence in the record, including Respondent's own admissions, that she knowingly took client and escrow funds without permission on multiple occasions, an order of disbarment will be entered. We therefore do not discuss other ethical violations Respondent committed.

IV.

A.

At the hearing before the Special Master, Respondent presented multiple character witnesses who offered compelling evidence of her personal and professional achievements. Based on that testimony, the Special Master found that "[h]er service to the community and good reputation are particularly exemplary." As noted earlier, the DRB similarly observed that "Respondent is

27

a remarkable person who has overcome tremendous personal obstacles . . . to become a pillar of her church and local community and what appeared to be an excellent member of the New Jersey bar." We agree with those conclusions and recount some of the testimony underlying them.

Several relatives testified about Respondent's upbringing and devotion to family. Respondent was born to a sixteen-year-old mother who struggled with substance abuse. Her father was not part of her life from the time she was three years old. Respondent's mother testified that by the time Respondent graduated from high school, the family had moved more than eleven times between Passaic and Newark. While her mother was in rehabilitation, Respondent lived with a cousin.

Respondent's brother testified about how she was a stable figure in his life. He admired her work ethic and focus while in school. Later in life, she helped take care of his children when he was imprisoned for drug distribution. Respondent represented him in the criminal case. Today, her brother owns a trucking company, and the two remain close. He confirmed that neither of them had any understanding of financial matters from their upbringing.

Respondent's uncle added that he helped raise her as a child when her mother fell on hard times. Years later, when he became very ill, Respondent offered to donate a kidney for a transplant.

Other witnesses testified about Respondent's extensive involvement with her church. A fellow congregant and real estate broker testified that Respondent conducted free legal seminars at the church. He also referred real estate matters to her and noted that she willingly and professionally helped clients even if the fee was not lucrative. A former instructor at a community college echoed that she was heavily involved with her church, family, and the community. He described her as a student leader who had the respect of her peers and was active in student government. A cousin who described Respondent as a mentor testified about other activities, including Respondent's volunteer work at an aviation school to teach inner-city youth about aviation.

Yet other witnesses spoke of her work as a lawyer. A trustee of Northeast New Jersey Legal Services testified Respondent was an active participant who provided pro bono services to clients and offered workshops and seminars on bankruptcy and real estate. In 2017, Legal Services bestowed an award on Respondent for her pro bono contributions. Respondent's uncle similarly recounted that he had referred many people who needed legal assistance but could not afford to pay Respondent, and she never refused to help them.

A law school classmate and practicing attorney described Respondent as very kind, giving, always willing to help others, honest, diligent, devout, and

dedicated to the law and the community. Another fellow solo practitioner and friend, who worked with Respondent on a number of legal projects over the years, praised Respondent as a hard-working, diligent, good-natured professional, with a really good heart and a strong commitment to her faith.

Vivian Clayton, a client whose funds were invaded, also testified as a character witness. She met Respondent at St. Luke Baptist Church in Paterson in around 2001. Ms. Clayton relayed that Respondent gave free legal clinics at the church and assisted with a transitional home for women, a summer camp program, and a school program. Notwithstanding the allegations in this disciplinary matter, Ms. Clayton described Respondent as kind, intelligent, truthful, and a hard worker with a "servant's heart."

Respondent testified as well. She explained that, while growing up in the midst of chaos, she grounded herself in two ways: through religion and in pursuit of her goal to become an attorney. After law school, she worked for the juvenile section of the Passaic County Probation Department. When she passed the bar, she opened a solo practice and focused on representing the underserved population of Paterson. She also immediately got involved with Northeast New Jersey Legal Services to do pro bono work. Legal Services honored her several times and gave her the Empowerment Award at its 50th anniversary banquet.

Respondent also described her volunteer efforts at the church where she co-founded the St. Luke's Legal Assistance Ministry; conducts various free legal seminars on domestic violence, bankruptcy, real estate, and wills and trusts; and serves as vice president of the community development board. In that position, she helps organize food drives for the needy and educational programs for children, among other community work.

B.

As the Special Master and the DRB recognized, Respondent has no prior disciplinary history. None of her clients lost money, and she promptly took remedial measures after the random audit. She cooperated with the OAE, readily admitted she borrowed clients' money without permission, and was contrite about her failure to maintain financial records properly.

C.

For the reasons discussed earlier, Respondent's personal and professional history does not provide a defense to a <u>Wilson</u> violation. But her accomplishments raise important questions about New Jersey's longstanding system of attorney discipline. In particular, should disbarment be <u>permanent</u> in all <u>Wilson</u> cases? Or should the disciplinary system offer disbarred attorneys like Respondent an opportunity for a second chance at a later point in time?

Many considerations bear on those questions, and we briefly examine a few of them.

V.

A.

All 50 states and the District of Columbia disbar attorneys who commit serious ethical violations. In a large majority of jurisdictions, however, disbarment is not permanent. Altogether, 41 states plus the District of Columbia allow attorneys to apply to be reinstated after they have been disbarred.

Most jurisdictions permit attorneys to apply for readmission 5 years after disbarment. See Ala. R. Disciplinary P. 28(b); Alaska Bar R. 29(b)(5); Ariz. R. Sup. Ct. 64(d); Ark. R. Pro. Conduct 24(B)(1); Cal. State Bar R. 5.442(B); Del. Laws.' R. Disciplinary P. 22(c); D.C. Bar R. XI, §16(a); Ga. R. Gov'g Admission Prac. L. pt. A, §10(a); Idaho Bar Comm'n R. 506(a); Ill. Sup. Ct. R. 767(a); Iowa Ct. R. 34.25(7); Me. Bar R. 29(a); Mich. Ct. R. 9.123(B)(2); Mo. Sup. Ct. R. 5.28(f)(2); Mont. R. Law. Disciplinary Enf't 29(C)(3); Neb. Ct. R. 3-310(T); N.C. R. State Bar ch. 1, subch. B, § .0129(a)(2); N.D. R. Law. Discipline 4.5(D); Okla. R. Gov'g Disciplinary Proc. 11.1(e); Pa. R. Disciplinary Enf't 218(b); R.I. Sup. Ct. R. art. III, R. 16(b); S.C. App. Ct. R. 413, R. Laws.' Disciplinary Enf't 33; S.D.C.L. § 16-19-83; Tex. R.

32

Disciplinary P. 11.01; Utah Code Jud. Admin. R. 14-707(c); Vt. Amin. Ord. 9, R. 26(A); Va. R. Sup. Ct. pt. VI, § IV, ¶ 13-25(F)(1); Wash. Admission Prac. R. 25.1(b); W. Va. R. Law. Disciplinary P. 3.33(b); Wis. Sup. Ct. R. 22.29(2); Wyo. R. Disciplinary P. 22(b)(1).

In addition to those 31 jurisdictions, 4 others impose variations on a 5-year time limit. See Conn. R. Super. Ct. §§ 2-53(b), 2-47A (5 years generally; 12 years for knowing misappropriation); R. Regulating Fla. Bar 3-7.10(n)(1) (5 years unless the order states disbarment is for a longer period or is permanent); Kan. Sup. Ct. R. 232(a)(3), (e)(1) (5 years unless the court determines more time is needed); R. Discipline Miss. State Bar 12(e), 12.1 (5 years except disbarment is permanent for attorneys convicted of certain felony criminal offenses).

Disbarred attorneys can apply for readmission or reinstatement after 1 year in Hawaii, Haw. R. Disciplinary Bd. 30(a); after 7 years in New Hampshire, N.H. Sup. Ct. R. 37(14)(c)(1)(A), and New York, N.Y. Ct. R. 1240.16(c)(1); and after 8 years in Colorado, Colo. R. Civ. P. 242.39(a)(1), and Massachusetts, Mass. R. Sup. Jud. Ct. 4.01, § 18(2)(a).

Maryland specifies the time to apply for reinstatement in each order of disbarment. Md. R. 19-752(c)(2)(B). Minnesota's court rule does not set a minimum waiting period to apply for readmission after disbarment, see Minn.

R. Laws. Pro. Resp. 18, but length of time since disbarment is a factor to be considered for reinstatement, In re Anderly, 696 N.W.2d 380, 385 (Minn. 2005).

Disbarment is permanent in only 8 states including New Jersey.  Ind. R. Admission Bar & Discipline Att'ys 23 § 3(a); Ky. Sup. Ct. R. 3.380; Nev. Sup. Ct. R. 102(1); N.J. Ct. R. 1:20-15A(a)(1), -16(i); N.M. State Ct. R. 17-214(A); Ohio Sup. Ct. R. Gov't Bar V, §12(B); Or. State Bar R. P. 6.1(d); Tenn. Sup. Ct. R. 9, § 30.2 (making disbarment permanent on or after July 1, 2020).

In one state, Louisiana, the Supreme Court retains discretion to permanently disbar a lawyer and prohibit the person from being readmitted. La. Sup. Ct. R. Law. Disciplinary Enf't 19, § 10(A)(1).

The majority rule is consistent with a recommendation of the American Bar Association.  ABA Model Rule 25A states that "[n]o lawyer may petition for readmission until five years after the effective date of disbarment."  ABA Model R. Law. Disciplinary Enf't 25(A) (Am. Bar Ass'n 2002).  The model rule also lists criteria for reinstatement and readmission.  They include compliance with all prior disciplinary orders; rehabilitative treatment for physical or mental infirmity, including alcohol or drug abuse; recognition of the wrongfulness and seriousness of the prior misconduct; proof of "the requisite honesty and integrity to practice law"; competency to practice; and

34

passage of the bar examination and character and fitness examination.  Id. R.
25E.

Many states outline similar factors to assess whether a disbarred attorney
should be reinstated.  The Supreme Court of South Dakota, for example,
considers the following ten factors:

1.  present moral fitness;

2.  acceptance of wrongdoing with sincerity and honesty;

3.  extent of rehabilitation;

4.  nature and seriousness of the original misconduct and the disrepute it brought on the legal profession;

5.  conduct following the discipline, including whether there has been any unauthorized practice of law;

6.  time elapsed since the original discipline;

7.  character, maturity and experience at the time of discipline and now;

8.  current competency and qualifications to practice law;

9.  restitution; and

10.  proof that resumption of the practice of law within the state will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive of the public interest.

[In re Pier, 561 N.W.2d 297, 301 (S.D. 1997).]

Sixteen states require petitioners to complete examination requirements as part of the reinstatement process. Arizona, California, Colorado, Florida, Georgia, Minnesota, Mississippi, Missouri, New Hampshire, Oklahoma, and South Carolina require disbarred lawyers to retake the bar examination. Ariz. R. Sup. Ct. 64(c); Cal. State Bar R. 5.441(B)(4)(a); Ga. R. Gov'g Admission Prac. L. pt. A, § 10(f); Okla. R. Gov'g Disciplinary Proc. 11.5(c); Colo. R. Civ. P. 242.39(a)(1) (also requires the Multistate Professional Responsibility Examination (MPRE)); R. Regulating Fla. Bar 3-7.10(f)(4)(B) (same); R. Discipline Miss. State Bar 12.5 (same); Mo. Sup. Ct. R. 5.28(b)(4), (d) (same); N.H. Sup. Ct. R. 37(14)(c)(2)(C), (D) (same); S.C. App. Ct. R. 413, R. Laws.' Disciplinary Enf't 33(f)(8) (same); Minn. R. Laws. Pro. Resp. 18(e) (requires completion of all written exams required for initial admission).

Connecticut, Rhode Island, and Virginia require passage of the MPRE. Conn. R. Super. Ct. § 2-53(d)(3); R.I. Sup. Ct. art. III, R. 16(d); Va. R. Sup. Ct. pt. 6, § IV, ¶ 13-25(F)(4). New York requires passage of the MPRE and may require applicants to retake the bar examination. N.Y. Ct. R. 1240.16(b). North Carolina requires passage of the bar examination and the MPRE when a petition is filed 7 or more years after disbarment. N.C. R. State Bar ch. 1, subch. B, § .0129(a)(5).

Several jurisdictions decide whether to require passage of the bar examination or the professional responsibility exam on a case-by-case basis. See Ala. R. Disciplinary P. 28(g)(5); Iowa Ct. R. 34.25(6); Md. R. 19-752(j).

B.

Those and other considerations are relevant to any thoughtful evaluation of whether disbarment for knowing misappropriation should be permanent. To assess those and other factors, the Court will convene a committee comprised of attorneys as well as members of the public who are not lawyers.

We will ask the committee to study whether disbarment should continue to be permanent in all Wilson cases and to recommend standards that might apply if New Jersey were to adopt the majority approach. Among other issues to consider are the following: After what period of time might attorneys be readmitted? What factors and standard of proof should apply to that judgment? Should disbarred attorneys be required to retake the bar examination or other courses on ethics, recordkeeping, and related subjects? What process might be adopted for readmission? And what rule changes might be warranted?

To be clear, we ask the committee to recommend whether to modify the rule of permanent disbarment for matters in which disbarment has been mandatory -- that is, for knowing misappropriation of client funds under

37

Wilson and of escrow funds under Hollendonner. The Court made clear in Sigman that disbarment was not required for knowing misappropriation of law firm funds. 220 N.J. at 158. We ask the committee to consider whether any rule change should apply to orders of disbarment entered before Sigman. There are yet other serious matters in which the Court exercised its discretion and permanently disbarred an attorney. We invite the committee's comments on that issue as well.

The committee's report will be made available to the public for comment before the Court determines how to proceed. See N.J. Const. art. VI, § 2, ¶ 3 ("The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted."). We welcome input from attorneys and the public to promote the key interests at the heart of the Wilson rule: how best to protect the public and maintain confidence in the legal profession.

## VI.

For those reasons, we enter an order of disbarment for Respondent and ask the Director of the Administrative Office of the Courts to help assemble a committee to study whether disbarment should continue to be permanent in all cases of knowing misappropriation.

38

JUSTICES ALBIN, PATTERSON, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion. JUDGE FUENTES (temporarily assigned) did not participate.